**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 96-10383
_____

ALEXANDER TITO HUMPHRIES,

Plaintiff-Appellant,

versus

VARIOUS FEDERAL USINS EMPLOYEES,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Texas

January 21, 1999

Before EMILIO M. GARZA, STEWART, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Alexander Tito Humphries, proceeding *pro se*, appeals from the district court's dismissal of

his various civil rights and contract claims as frivolous under 28 U.S.C. § 1915(d), now designated

28 U.S.C. § 1915(e)(2)(B)(i).  We affirm in part, reverse in part, and remand.

I

The complaint presently before us consists of numerous handwritten pages, submitted along

with various attachments in the form of what purport to be original documents and photocopies of

such documents. The complaint as a whole is difficult to understand, but generally appears to allege the following facts: In March 1986, Humphries, a citizen of Kenya, entered the United States on a nonimmigrant visa. At some point during the next several years, Humphries began working for the United States Customs Service (the "Customs Service") as a confidential informant, providing undercover officers with various leads as to drug-related activity. In November 1991, Humphries traveled to Kenya under the supervision of the Customs Service in order to participate in a two-week, undercover drug-buying operation. Humphries had intended to use some of this time to renew his visa, which had expired earlier that year, but his supervisors kept him too busy to fill out the proper paperwork. Humphries therefore returned from his trip without a valid visa to authorize his re-entry into the United States. Federal Bureau of Investigation ("FBI") agent Robert Dodge solved this problem by paroling Humphries into the country "in the public interest."

Following the November 1991 trip to Kenya, Humphries may have left the country and returned as many as two or three times—on each occasion being paroled back into the United States "in the public interest." In May 1993, Humphries' employment with the Customs Service appears to have ended, but the Immigration and Naturalization Service ("INS") made no move to revoke Humphries' parole. Approximately one year later, in April 1994, Humphries began working with both the INS and the FBI in an investigation of Sunday Ukwu, a Nigerian national suspected of importing heroin and forging immigration documents. At some point during the investigation, Humphries became concerned that the government's tactics amounted to entrapment. Humphries voiced these concerns to his supervisors, but the government proceeded with the investigation, ultimately convicting Ukwu and several associates of bribing a public official, immigration document fraud, and conspiracy.

Following Ukwu's conviction, the INS, under George Putnam's signature, filed an official charging document known as an "I-122" against Humphries. The form provided written notice that the INS was terminating Humphries' parole and instituting exclusion[1] proceedings against him, based on his lack of a valid visa. Humphries sought to persuade the INS that he was actively involved with the Customs Service in an ongoing undercover investigation, but Special Agents Alex Nick and Ken Kates contradicted these claims. Based on the I-122, an Immigration Judge ordered Humphries excluded from the United States.

Separate and apart from these factual allegations, the parties currently before us agree that Humphries did in fact receive an order of exclusion from an Immigration Judge, and that after raising various, unsuccessful legal challenges to this decision, Humphries left the United States for his home country of Kenya on June 18, 1997.[2] Before leaving the United States, however, Humphries filed the present complaint *pro se* in federal district court, alleging generally that various government officials, including Dodge, Putnam, Kates, and Nick,[3] had conspired to deprive him of his constitutional rights. The exact contours of these claims are difficult to discern, but the pleadings, liberally construed, indicate five general complaints. First, Humphries claims that various government agents deprived

---

[1]     "Exclusion" once referred to a denial of entry, while "deportation" referred to the expulsion of an alien already residing within the United States. *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 159, 113 S. Ct. 2549, 2552, 125 L. Ed. 2d 128 (1993). Aliens paroled into the country and subsequently required to leave were nevertheless termed "excluded" rather than "deported" under the legal fiction that parolees remained "at the border" awaiting a decision on admissibility. *See id.* at n.5. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996) (codified as amended in scattered sections of 8 U.S.C.), abandoned this dichotomy and now refers jointly to both decisions as "removal." *See* IIRIRA § 304(a)(7). We will use either the old term "exclusion" or the new term "removal", as appropriate.

[2]     The record is unclear as to whether Humphries was formally   excluded, agreed to voluntarily depart, or requested that the INS exclude him in lieu of being placed in detention. For present purposes, these distinctions are irrelevant.

[3]     Nothing in the record before us indicates  whether  any  party has been formally served with Humphries' complaint. The INS was notified of Humphries' appeal, and that agency did appear before us at oral argument.

Sunday Ukwu of a fair trial, initially by entrapping Ukwu and then by perjuring themselves on the stand at his trial ("entrapment" claim). Second, Humphries complains that he was forced to work for the INS under threats of deportation in violation of the Thirteenth Amendment ("involuntary servitude" claim). Third, Humphries claims that he was mistreated and subjected to various constitutional violations while in detention awaiting exclusion ("mistreatment while in detention" claim). Fourth, Humphries claims that his parole was revoked and exclusion proceedings begun in direct retaliation for his speaking out about the agencies' entrapment of Ukwu ("retaliatory exclusion" claim). Fifth, Humphries claims that the government made various oral contracts with him as to how he would be paid and what benefits he would receive at the end of the Ukwu investigation ("breach of contract" claim). In terms of requested relief, Humphries' complaint makes vague references to the injustice of Humphries' then-impending exclusion, but is explicit in seeking damages for each of the above claims as well as specific performance for certain of the alleged contracts.

The district court assigned the case to a magistrate judge, who characterized the complaint as a request for damages resulting from a "wrongful deportation." Based on that characterization, the magistrate judge recommended dismissing the complaint as frivolous in light of *Heck v. Humphrey*, 512 U.S. 477, 487, 114 S. Ct. 2364, 2372, 129 L. Ed. 2d 383 (1994) (holding that no cause of action exists under § 1983 for actions that, if proven, would "necessarily imply" the invalidity of an underlying conviction or sentence, unless that conviction or sentence is first properly invalidated, either on appeal or through habeas). The district court followed this recommendation and adopted the opinion of the magistrate judge as its own. Following Humphries' timely appeal, we recognized that the question of whether we should apply the rationale of *Heck* in the context of exclusion is an issue of first impression in this Circuit. We therefore appointed counsel to argue this

-4-

issue on Humphries' behalf before the court.

## II

Because the district court dismissed this case as frivolous under 28 U.S.C. § 1915(d), now designated 28 U.S.C. § 1915(e)(2)(B)(i) by § 804 of the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996),[4] we review the dismissal only for an abuse of discretion. *See McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997). In determining whether a district court abused its discretion, we consider factors such as "whether (1) the plaintiff is proceeding *pro se*, (2) the court inappropriately resolved genuine issues of disputed fact, (3) the court applied erroneous legal conclusions, (4) the court has provided a statement of reasons which facilitates 'intelligent appellate review,' and (5) any factual frivolousness could have been remedied through a more specific pleading." *Moore v. Mabus*, 976 F.2d 268, 270 (5th Cir. 1992).

Humphries urges that we find an abuse of discretion here because the district court's application of *Heck* in this context is both legally incorrect and factually irrelevant. In *Heck*, the Supreme Court held that in order to state a claim under § 1983 for a constitutional violation that, if

---

[4] Prior to the passage of the PLRA, § 1915(d) simply provided that a court "may dismiss [a] case [brought *in forma pauperis*] if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious." 28 U.S.C. § 1915(d) (1988). The corresponding portion of § 1915(e) now provides:

> (2) Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that—
> (A) the allegation of poverty is untrue; or
> (B) the action or appeal—
>     (i) is frivolous or malicious;
>     (ii) fails to state a claim on which relief may be granted; or
>     (iii) seeks monetary relief against a defendant who is immune from such relief.

28 U.S.C. § 1915(e)(2). Because on remand the district court may yet determine that Humphries' remaining claims are frivolous, we need not address the applicability of the new § 1915(e)(2)(B)(ii) or (iii). *See McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) (reviewing the dismissal as one under § 1915(d) although the PLRA was in effect at the time of appeal).

proven, would imply the invalidity of a criminal conviction or sentence, one first must demonstrate that some proper tribunal has held the conviction or sentence invalid. *See Heck*, 515 U.S. at 486-87, 114 S. Ct. at 2372. Applying this rationale in the context of immigration law, the district court determined that in order to state a cause of action for a constitutional violation that, if proven, would imply the invalidity of an exclusion order, one first must demonstrate that some proper tribunal has held the order invalid. Humphries claims that this holding stretches *Heck* beyond its underlying principles[5] and that, in any event, most of his claims have no legal relationship to his order of exclusion.

The government, on the other hand, refuses to differentiate among any of Humphries' individual claims, instead relying on the district court's characterization of the complaint as challenging solely the validity of Humphries' exclusion order. On that basis, the government argues that (1) Humphries' claim is moot in light of the fact that he was excluded at his own request on June 18, 1997, (2) even assuming a live controversy, Congress' recent amendments to the Immigration and Naturalization Act ("INA") deprive us of jurisdiction over Humphries' claims, and (3) assuming jurisdiction, the district court nevertheless correctly applied *Heck* in dismissing Humphries' complaint. After addressing elementary issues of standing and jurisdiction, we will consider in turn the government's arguments regarding the requested injunctive relief, jurisdiction under the amended INA, and the applicability of *Heck v. Humphrey*.

III

---

[5]    We have applied *Heck* previously in a multitude of situations, *see, e.g., Stephenson v. Reno*, 28 F.3d 26, 27 (5th Cir. 1994) (*Bivens* actions); *Littles v. Bd. of Pardons and Paroles Div.*, 68 F.3d 122, 123 (5th Cir. 1995) (parole-revocation proceedings); *Jackson v. Vannoy*, 49 F.3d 175, 177 (5th Cir. 1995)(probation-revocation proceedings); *cf. Edwards v. Balisok*, 520 U.S. 641, ___, 117 S. Ct. 1584, 1588, 137 L. Ed. 2d 906 (1997) (disciplinary proceedings involving the deprivation of good-time credits), although never in the context of removal.

A

Humphries' claim of entrapment alleges generally that various government officials conspired to entrap Sunday Ukwu and deny him a fair trial. Humphries has articulated no concrete, personal injury fairly traceable to this behavior, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992), and we therefore hold that the district court did not abuse its discretion in dismissing this claim as frivolous.

B

Humphries' claims of breach of contract allege that Agents Putnam and Dodge made various agreements in exchange for Humphries' services as an informant. For these alleged agreements to prove enforceable, Agents Putnam and Dodge must have been acting in their official, as opposed to their individual, capacity. *See Whiteside v. United States*, 93 U.S. 247, 257, 23 L. Ed. 882 (1876) (noting that the government is generally not bound by the unauthorized actions of its agents) (citing STORY'S AGENCY (6th ed.) § 307(a)). A contract suit against a government agent in his official capacity, however, is nothing more than a suit directly against the sovereign—permissible only within the limited confines of the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491. *See Ware v. United States*, 626 F.2d 1278, 1286-87 (5th Cir. 1980) (noting that the Tucker Act constitutes a limited waiver of sovereign immunity for contract claims against the United States government). Moreover, "[t]he law of this circuit is clear [that] the Court of Claims has exclusive jurisdiction of a Tucker Act claim in excess of $10,000." *Id.* at 1287. Because Humphries requested $65,000 as "money owed for his participation in the case [of Sunday Ukwu]," the district court had no jurisdiction to entertain Humphries' claims for breach of contract. *Id.* Accordingly, we find no abuse of discretion in the district court's dismissal of these claims as frivolous. *See, e.g., Oltremari v. Kansas Soc. &*

-7-

*Rehabilitative Serv.*, 871 F. Supp. 1331, 1333 (D. Kan. 1994) ("A complaint is frivolous within the meaning of § 1915(d), if its subject matter is outside the jurisdiction of the court."); *Johnson v. Eastern Band Cherokee Nation*, 718 F. Supp. 6, 6 (N.D.N.Y. 1989) ("When a court does not have jurisdiction to hear an action, the claim is considered frivolous.").

IV

With regard to Humphries' remaining claims of involuntary servitude, mistreatment while in detention, and retaliatory exclusion, we agree with the INS that to the extent these claims seek injunctive relief against Humphries' exclusion, they are moot. On June 18, 1997, Humphries left the United States for Kenya, and no order of this court can reverse that event. *See Marilyn T., Inc. v. Evans*, 803 F.2d 1383, 1384-85 (5th Cir. 1986) (holding an appeal from a denial of a preliminary injunction moot because "'[n]o order of [the court] could affect the parties' rights with respect to the injunction we are called upon to review'") (quoting *Honig v. Students of the Cal. Sch. for the Blind*, 471 U.S. 148, 149, 105 S. Ct. 1820, 1821, 85 L. Ed. 2d 114, 116 (1985)). To the extent that Humphries seeks other relief for the violations alleged in his complaint, we must address whether we retain jurisdiction over any of these claims in light of Congress' recent amendments to the Immigration and Naturalization Act. *Cf. Henschen v. City of Houston*, 959 F.2d 584, 587 (5th Cir. 1992) (holding that the mooting of appellants' request for injunctive relief did not necessarily moot appellants' claim for money damages).

V

On September 30, 1996, after the entry of Humphries' final order of exclusion and after Humphries filed the present civil suit, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), significantly

restructuring the scope of judicial review of immigration decisions. Specifically, § 306(a)(2) of IIRIRA, now codified at 8 U.S.C. § 1252, provides that aliens may obtain direct judicial review of removal decisions only by filing a petition for review in the relevant Circuit Court of Appeals. 8 U.S.C. § 1252(a) ("Judicial review of a final order of removal . . . is governed only by chapter 158 of Title 28 [providing generally for the review of agency action through a petition filed directly in the court of appeals]."). Certain portions of the statute also provide limited avenues for collateral review of such decisions. *See*, *e.g.*, 8 U.S.C. § 1252(b)(7) (providing that certain criminal defendants may collaterally challenge the validity of an order of removal through a pre-trial motion). Subsection (g) solidifies this structure by mandating that "except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g).

Humphries does not dispute that § 1252 applies retroactively to his complaint, and indeed Congress stated explicitly in § 306(c)(1) of IIRIRA that subsection (g) applies "without limitation to claims arising from all past, pending, or future exclusion, deportation or removal proceedings." *See American-Arab Anti-Discrimination Comm. v. Reno*, 119 F.3d 1367, 1371 (9th Cir. 1997) (noting that "because IIRIRA [explicitly provides for] the retroactivity of the relevant jurisdictional provision, we need not apply the default rules elaborated in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280-81, 114 S. Ct. 1483, 1505, 128 L. Ed. 2d 229 (1994)); *Thomas v. INS*, 975 F. Supp. 840, 845 (W.D. La. 1997). Humphries does dispute the relevance of this provision to his particular claims. Initially, Humphries points us to the title of the provision, "Judicial Review of Orders of Removal," and argues

that this section purports to govern only "direct" judicial review of removal orders, leaving other actions that might collaterally attack such an order (such as a civil damages action) outside its scope. The language of § 1252 itself belies this interpretation. Subsection (c) explicitly applies both to petitions for review—by which an alien can directly attack a rem oval order—and to petitions for habeas corpus—by which an alien might collaterally attack such an order. *See* 8 U.S.C. § 1252(c) ("A petition for review or for habeas corpus of an order of removal shall . . ."). In addition, subsection (b)(7)(A) provides for a collateral challenge to a removal order through a criminal proceeding. *See* 8 U.S.C. § 1252(b)(7)(A). In light of these provisions, we cannot say that § 1252 generally purports to regulate only direct challenges to a removal order. Any attempt to challenge such an order, therefore, whether direct or collateral, must either find authorization in § 1252(a)-(f) or be precluded to the extent that § 1252(g) applies.[6]

Initially, we note that nothing in subsections (a) through (f) contemplates an alien challenging his removal through a civil damage action against the INS or its officials.[7] The question then becomes whether Humphries' remaining claims do in fact challenge his removal, or, more precisely, whether those claims "aris[e] from the decision or action of the Attorney General to commence proceedings, adjudicate cases or execute removal orders." 8 U.S.C. § 1252(g).

---

[6] We express no opinion on the extent to which other federal statutes (most notably 28 U.S.C. § 2241) might limit the application of § 1252(g). *Compare Yang v. INS*, 109 F.3d 1185, 1195 (7th Cir.), *cert. denied*, ___ U.S. ___, 118 S. Ct. 624, 139 L. Ed. 2d 605 (1997) (holding that § 1252 "abolishes even review under section 2241"), *with American-Arab Anti-Discrimination Comm.*, 119 F.3d at 1374 (noting that "[s]ome form of statutory habeas relief may remain available").

[7] Subsection (a) governs petitions for review of final orders of removal; subsection (b) sets out certain procedural requirements applicable to the review of an order of removal under subsection (a); subsection (c) sets out additional procedural requirements applicable to both petitions for review and petitions for habeas corpus; subsection (d) mandates that aliens exhaust their administrative remedies before appealing a final order of removal, and attempts to prevent repetitious litigation of the validity of such orders; subsection (e) relates to judicial review of orders under § 1225(b)(1), authorizing the Attorney General to grant asylum to aliens meeting certain criteria; subsection (f) places limits on the degree to which federal courts may enjoin the operation of the present statute. 8 U.S.C. § 1252.

A

In determining whether any of Humphries' remaining claims—for involuntary servitude, mistreatment while in detention, or retaliatory exclusion—"aris[e] from" certain decisions or actions, we find little assistance in the precise language of the statute. Congress has provided no explicit definition of the phrase "arising from," and courts have not always agreed on its plain meaning. *Compare Continental Cas. Co. v. City of Richmond*, 763 F.2d 1076, 1080 (9th Cir. 1985) (characterizing "arising out of" as "words of much broader significance than 'caused by' [and]. . . ordinarily understood to mean 'originating from' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to, or having connection with'") (quoting *Red Ball Motor Freight, Inc. v. Employers Mut. Liab. Ins. Co.*, 189 F.2d 374, 378 (5th Cir. 1951)), *with Chedid v. Boardwalk Regency Corp.*, 756 F. Supp. 941, 943 (E.D. Va. 1991) (noting that the "plain meaning" of the phrase "arising from" is "caused by," requiring an element of causation greater than "simple 'but-for' causation," and "something [more] akin to legal or proximate causation") (citing *Pizarro v. Hoteles Concorde Int'l C.A.*, 907 F.2d 1256, 1259 (1st Cir. 1990)). As a general matter, "arising from" does seem to describe a nexus somewhat more tight than the also frequently used phrase "related to." *See, e.g.*, *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 404 (1984) (Brennan, J., dissenting) (suggesting that there is a "substantial difference" between a requirement that a cause of action "formally 'arise out of' specific activities" and a requirement that a cause of action merely "relate to" those activities); *compare American Guar. & Liab. Ins. Co. v. 1906 Co.*, 129 F.3d 802, 807 (5th Cir. 1997) (concluding that "the phrase 'arising out of' the 'use' of the designated premises requires that there be a causal connection between the injuries [alleged] . . . and the designated premises"), *with Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97, 103 S.

-11-

Ct. 2890, 2900, 77 L. Ed. 2d 490 (1983) (holding that a law "relates to" an employee benefit plan within the meaning of ERISA's preemption provision "if [the law] has a connection with or reference to such a plan"). The exact contours of the required nexus are nevertheless difficult to discern. *See*, *e.g.*, *Mid Century Ins. Co. v. Lindsey*, 942 S.W.2d 140, 145 (Tex. App. 1997) (writ granted April 14, 1998) (acknowledging that the phrase "arise out of" does not require a relationship of proximate cause, but noting that "[c]ourts have applied at least six different tests for determining whether [the proper] causal connection" exists).

Given the nature of Humphries' claims, however, we need not struggle here to definitively construe the precise meaning of the phrase "arising from" as that term is used in § 1252(g). Instead, we focus for present purposes on the relatively unobjectionable ends of the spectrum along which a more precise, clearly ascertainable definition of "arising from" lies. At one end of that spectrum we find claims clearly not included within the definition of "arising from," *i.e.*, those claims with no more than a weak, remote, or tenuous connection to a "decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." *Cf. Eaglin v. United States Dept. of Army*, 794 F.2d 981, 984 (5th Cir. 1986) (holding that plaintiff's claim did not "arise in" the United States for purposes of establishing subject-matter jurisdiction under the Federal Tort Claims Act "because the nexus between her claim and any act or omission in the United States is simply too tenuous and remote") (footnote omitted); *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 27 n.32, 103 S. Ct. 2841, 2855 n.32, 77 L. Ed. 2d 420 (1983) ("The connection between appellant's causes of action and a . . . trust agreement [allegedly covered by § 301] is too attenuated for us to say that [these causes of action] 'arise[] under' § 301."). At the other end of the spectrum we find claims that clearly are included within the definition of "arising from," *i.e.*, those

-12-

claims connected directly and immediately with a "decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." *Cf. Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1225 (5th Cir. 1985) (holding that "insofar as the alleged breach of contract relates directly to platform construction, the controversy is one 'arising out of, or in connection with' an operation [covered by] the Outer Continental Shelf Lands Act"); *Fireman's Fund Ins. Co. v. National Bank of Coops.*, 103 F.3d 888, 894 (9th Cir. 1996) (noting that even when one interprets "arising out of" to require only a standard of "but for" causation, "a lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between those contacts and the cause of action"); *Mantello v. Hall*, 947 F. Supp. 92, 100 (S.D.N.Y. 1996) ("For a tort claim to arise out of [the] transaction of business in New York, the connection between the transaction and the claim must be direct."). Thus, by defining the ends of this spectrum, we may dispose of the remainder of Humphries' claims.

1

Humphries' involuntary servitude claim alleges that the INS and the FBI "coer[c]ed [Humphries] on several occasions with threats of deportation if [he] did not continue to work for them." *See United States v. Kozminski*, 487 U.S. 931, 948, 108 S. Ct. 2751, 2762, 101 L. Ed. 2d 788 (1988) ("[I]t is possible that threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude [as defined by the Thirteenth Amendment]."). Although the heart of this complaint rests somewhat on Humphries status as a discretionary parolee—in the sense that this status provided the agents with the power to back up their alleged threats—the question of whether this claim "aris[es] from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders" is simpler,

perhaps, than it appears. For at the time this claim arose, *i.e.*, when the threats were allegedly made and Humphries allegedly began working under coercion, the Attorney General, through her subordinates, had yet to commence proceedings against Humphries, much less adjudicate his case or execute a removal order against him. Indeed, as we discuss below in relation to Humphries retaliatory exclusion claim, proceedings against Humphries did not commence until after Ukwu's conviction, and even then, according to Humphries, only because the agents became frustrated with Humphries' outspoken criticism of Ukwu's trial—not because the agents were carrying out a threat related to Humphries' refusal to work. Viewed in this light, we would defy logic by holding that a claim for relief somehow "aris[es] from" decisions and actions accomplished only after the injury allegedly occurred. Accordingly, we find that Humphries' claim for involuntary servitude does not "aris[e] from the decision or action of the Attorney General to commence proceedings, adjudicate cases, or execute removal orders," and that § 1252(g) therefore presents no bar to the adjudication of this claim.

2

As for Humphries' allegations of mistreatment while in detention,[8] these claims bear no more than a remote relationship to the Attorney General's decision to "execute [Humphries'] removal order." Naturally, Humphries would not have been subjected to the alleged mistreatment had the decision not been made to place Humphries in detention while awaiting exclusion. Yet as one Supreme Court Justice aptly noted, "[l]ife is too short to pursue every human act to its most remote

---

[8]    Ranging from trivial to serious, these claims run the gamut from allegations that Humphries' cell was not provided with a proper mattress to claims that prison officials intentionally placed Humphries in physical danger by forcing him to share a cell with relatives and associates of the people he had helped convict. Significantly, Humphries does not appear to challenge the fact of his confinement, separate and apart from his claims that the exclusion itself was unconstitutionally retaliatory.

consequences; 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 287, 112 S. Ct. 1311, 1327, 117 L. Ed. 2d 532 (1992) (Scalia, J., concurring). Similarly, the fact that Humphries would never have suffered the alleged injuries had he never been placed in detention tells us more about fate than the origins of Humphries' cause of action. Thus, whatever the precise contours of "arising from" as that phrase is used in § 1252(g), it does not encompass a connection so remote as having been placed in a situation in which certain third parties subsequently cause an alleged injury.

3

Humphries' claim for retaliatory exclusion, however, proves more problematic. This claim alleges that various INS agents conspired to exclude Humphries in retaliation for the exercise of his First Amendment rights—particularly his vocal criticism of the government's investigatory tactics with regard to Sunday Ukwu. However broadly or narrowly we might interpret § 1252(g), this claim bears more than a cursory relationship to the Attorney General's decision to exclude Humphries. Indeed, in addition to being a significant and important event in the chain of causation leading to Humphries' alleged unconstitutional exclusion, the Attorney General's decision to place Humphries in exclusion proceedings appears to provide the most direct, immediate, and recognizable cause of Humphries' injury. Pursuant to § 1252(g), we therefore have no jurisdiction to entertain Humphries' allegations that the INS excluded him in violation of the First Amendment. Aliens wishing to raise such challenges in the future should do so either in a petition for review or for habeas corpus.[9]

---

[9] To whatever extent future panels may interpret § 1252 to limit these other avenues of relief, this court may find itself confronted with the precise problem raised but avoided by the Supreme Court in *Webster v. Doe*, 486 U.S. 592, 603, 108 S. Ct. 2047, 2053, 100 L. Ed. 2d 632 (1988) (noting that a "'serious constitutional question' . . . would

B

In summary, we have merely delineated the outer boundaries of "arising from" as Congress used that term in § 1252(g). We have determined that § 1252(g) permits the adjudication of Humphries' claims for involuntary servitude and mistreatment while in detention, but forbids the exercise of jurisdiction over Humphries' claim for retaliatory exclusion.[10]

VI

Because we retain jurisdiction over Humphries' claims for involuntary servitude and mistreatment while in detention, we now briefly dispose of the government's argument that *Heck v. Humphrey* provides sufficient support for an affirmance of the district court's judgment as to these

---

arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim"). *See also McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 493, 111 S. Ct. 888, 896-97, 112 L. Ed. 2d 1005 (1991) ("Because the administrative appeals process does not address the kind of procedural and constitutional claims [brought] in this action, limiting judicial review of these claims to [a review of that administrative process] is not contemplated by the language of [§ 210(e)(3)(A) of the amended INA]."). This issue is not before us today, and we therefore do not address it.

[10]    The dissent argues that "§ 1252(g) of 8 U.S.C. may not be read to deny an alien a judicial forum for a colorable constitutional claim for money damages under *Bivens* based on the violation of the alien's constitutional rights by federal agents acting under color of federal law." We note simply that in enacting § 1252, Congress removed jurisdiction from the district courts and consolidated judicial review into the court of appeals. *See Richardson v. Reno*, No. 98-4230, 1998 WL 889376, at *10-12 (11th Cir. Dec. 22, 1998)(noting that "Congress strictly regulated the exclusive mode and timing of judicial review in order to remove overlapping jurisdiction and to prevent dilatory tactics previously used to forestall departure of aliens"). Any constitutionally required judicial review of Humphries' claims can occur in the form of a petition for review in the court of appeals. *See* 8 U.S.C. § 1252(b); *see also Massieu v. Reno*, 91 F.3d 416, 424-26 (3d Cir. 1996)(dismissing alien's complaint alleging irreparable selective enforcement in retaliation for an exercise of First Amendment rights, noting that alien had failed to exhaust his administrative remedies, and that "[a]lthough the immigration judge is not authorized to consider the constitutionality of the statute, this court can hear the challenge upon completion of the administrative proceedings under *INS v. Chadha*")(citing *INS v. Chadha*, 462 U.S. 919, 938, 103 S. Ct. 2764, 2777, 77 L. Ed. 2d 317, __ (1983)). The language of § 1252(g) is plain and unambiguous: "Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim on behalf of any alien arising from the decision or action by the Attorney General . . . ." 8 U.S.C. § 1252(g). In light of Congress's plenary power over matters concerning immigration, we will not ignore this statutory mandate in an effort to preserve Humphries' constitutional claims. *See Reno v. Flores*, 507 U.S. 292, 305, 113 S. Ct. 1439, 1449, 121 L. Ed. 2d 1, __ (1993)("[T]he responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. . . . [O]ver no conceivable subject is the legislative power of Congress more complete")(internal citations omitted).

-16-

claims under § 1915(d). *Heck* itself provides for preclusion of only those claims that, if proven, would necessarily imply the invalidity of a conviction or sentence. *See Heck*, 512 U.S. at 487, 114 S. Ct. at 2372. Similarly, even if *Heck* were to apply in the context of immigration orders, it would, by analogy, bar only those claims that "necessarily imply" the invalidity of an INS or BIA order. *Id.*

Assuming *arguendo* that Humphries were to recover damages for the alleged involuntary servitude as well as the alleged mistreatment while in detention, these judgments would in no way imply the invalidity of Humphries' detention or exclusion. *See* 8 U.S.C. § 1182(a)(7)(B)(i)(II) (authorizing the exclusion of nonimmigrants "not in possession of a valid nonimmigrant visa . . . at the time of application for admission"); *cf. Edwards v. Balisok*, 520 U.S. 641, ___, 117 S. Ct. 1584, 1588-89, 137 L. Ed. 2d 906 (1997) (holding that *Heck* applies when the procedural defects alleged to have occurred in a relevant proceeding are so severe as to "necessarily imply" the complete invalidity of the proceeding). Indeed, as articulated above, these remaining claims have no meaningful relationship to those decisions or actions relevant to Humphries' immigration status.[11] The INS conceded as much at oral argument, at least with respect to Humphries' claims for mistreatment while in detention.[12] *Cf. Hamilton v. Lyons*, 74 F.3d 99 (5th Cir. 1996) (holding that *Heck* does not render a prisoner's claim challenging the conditions of his confinement uncognizable under § 1983).

We will not examine the legal applicability of *Heck v. Humphrey* to immigration orders when

---

[11]     Although at first blush, it may seem that no claim surviving the gauntlet of § 1252(g) would then be precluded by an application of *Heck v. Humphrey*, we are unprepared at this juncture to make such a holding. Inspired by *Edwards v. Balisok*, ___ U.S. ___, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997) at least one scenario comes to mind in which Heck may bar a claim over which we retain jurisdiction under § 1252(g). An alien whose claim arises from INS misconduct during an exclusion proceeding, for instance, may be able to invoke our jurisdiction despite § 1252(g), but because that error may in fact impugn the validity of the underlying proceeding, *Heck* may prove relevant. *See id.*

[12]     In its brief, however, the INS maintained that all of Humphries' claims, with the exception of those alleging breach of contract, were barred by *Heck*.

no factual basis appears for that application. We therefore hold that the district court erred in determining that *Heck v. Humphrey* renders Humphries' claims for involuntary servitude and mistreatment while in detention frivolous under § 1915(d). Because the district court provided no other basis on which to find these claims frivolous, and none appears obvious from the record, these claims are remanded to the district court for further proceedings consistent with this opinion. On remand, the district court may revisit the issue of frivolousness to the extent that its reasoning is not explitly foreclosed by the present opinion.

## VII

In summary, the district court's dismissal of Humphries' claims with regard to the alleged entrapment of Sunday Ukwu, the government's alleged breach of contract, and the government's alleged retaliatory exclusion is AFFIRMED, although on different grounds than those articulated by the district court; the district court's decision to dismiss Humphries' claims for involuntary servitude and mistreatment while in detention is REVERSED, and these claims REMANDED for further proceedings in accordance with this opinion. The government's motion to strike Humphries' appeal because of his alleged fugitive status prior to leaving for Kenya is DENIED. *See Degen v.United States*, 517 U.S. 820, ___, 116 S. Ct. 1777, 1782-83, 135 L. Ed. 2d 102 (1996).[13]

---

[13] *But see United States v. Real Property Located at 14301 Gateway Blvd. West,* 123 F.3d 312, 314 (5th Cir. 1997) (Garza, J., specially concurring) (indicating that *Degen* was ill-considered and should be overruled, particularly in light of the ease and regularity with which residents of border communities in the southwestern United States cross into Mexico——a journey more akin to "visiting another part of town [than] another nation").

DENNIS, Circuit Judge, concurring in part and dissenting in part:

I concur in parts I through III B of the majority opinion. I also concur in the majority opinion's decree insofar as it affirms the district court's dismissal of Humphries' entrapment and breach of contract claims, reverses the district court's dismissal of his involuntary servitude and mistreatment claims, and denies the government's motion to strike his appeal.

I respectfully dissent, however, from the majority opinion's affirmance of the district court's dismissal of Humphries' <u>Bivens</u> action for money damages based on alleged violations of his First Amendment rights and from the majority's failure to reject as unmeritorious the government's argument that <u>Heck v. Humphrey</u> bars the federal courts from considering the plaintiff's civil actions.

1.

In <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), the Supreme Court held that when a state prisoner seeks damages in a 42 U.S.C. § 1983 suit, the complaint must be dismissed if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," unless the plaintiff can show that the conviction or sentence has already been invalidated. <u>Heck</u>, 512 U.S. at 487. "But[,the Court added, when] the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action

-19-

should be allowed to proceed, in the absence of some other bar to the suit." Id. In Edwards v. Balisok, 520 U.S. 641, 117 S. Ct. 1584, 1586 (1997), the Court held that a prisoner's § 1983 claim for damages should also be dismissed even when the complaint limits his request to damages for depriving him of good-time credits without due process, not for depriving him of good-time credits undeservedly as a substantive matter, if the nature of the challenge to the procedures is "such as necessarily [will] imply the invalidity of the judgment." Id. at 1587.

In the present case, however, the Heck and Balisok holdings do not require that the plaintiff's Bivens civil actions for damages be dismissed. Alexander Tito Humphries is not a state prisoner. See, e.g., Ojo v. INS, 106 F.3d 680 (5th Cir. 1997) (stating that a detained alien is not a prisoner within the meaning of criminal law). He has not been convicted of any crime or sentenced therefor. INS v. Lopez-Mendoza, 468 U.S. 1032, 104 S. Ct. 3479 (1984) (stating that deportation proceeding is a purely civil action to determine an alien's eligibility to remain in the United States). Consequently, because "the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." Heck, 512 U.S. at 487.

2.

As the majority opinion correctly holds, there are "other

-20-

bars" to some, but not all, of the plaintiff's actions. I agree with the majority opinion that Humphries does not have standing to assert a claim based on the alleged entrapment of Sunday Ukwu, that the district court does not have jurisdiction to entertain Humphries' claims for breach of contract, and that Humphries' petition to enjoin the removal proceedings was mooted by the definitive finality of the removal order and his actual removal to Kenya.

3.

On the other hand, although I agree with the majority's result in allowing Humphries to proceed on his claims based on constitutional due process and involuntary servitude violations, I believe the majority did not apply the correct analysis in determining the contours of Humphries' directly implied constitutional rights, and consequently erred in concluding that his First Amendment claim is barred. The majority treated the constitutional provisions supporting Humphries' claims as if they were statutes to be reconciled with the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and therefore reached the incorrect result in affirming the dismissal of Humphries' <u>Bivens</u> action for money damages based on alleged violations of his First Amendment rights. Under the analysis required by the Supreme Court's decisions, however, none of Humphries' actions for money damages based on the federal agents' alleged violations of his constitutional rights is frivolous or

falls outside the jurisdiction of the federal district court.

The federal judicial power extends to all cases, in law and equity, arising under the Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority. U.S. Const. art. III, § 1, cl. 2. Since 1875, Congress has provided the federal trial courts with general jurisdiction over such cases. See Judiciary Act of March 3, 1875, § 1, 18 Stat. 470; Schweiker v. Chilicky, 487 U.S. 412, 420 (1988). The statute now provides that the "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

All persons within the territory of the United States are entitled to the protections guaranteed by the Fifth, Sixth and Fourteenth Amendments to the Constitution. Wong Wing v. United States, 163 U.S. 228, 238 (1896). Aliens living within the jurisdiction of the United States are protected from deprivation of life, liberty or property without due process of law, despite the fact that such presence is unlawful, involuntary or transitory. Mathews v. Diaz, 426 U.S. 67, 77 (1976). In general, therefore, a United States district court may consider the merits of a Bivens action for money damages, asserted by a nonresident alien who is present in this country, against federal government officials. See Xiao v. Reno, 837 F. Supp. 1506 (N.D. Cal. 1993); Immigration Law Service § 27:14 (Alan Jacobs ed., Clark Boardman Callaghan 1994).

Similarly, under 42 U.S.C. § 1983, every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any alien within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, is liable to the alien injured in an action at law, suit in equity, or other proceeding for redress. Examining Board Of Engineers, Architects & Surveyors v. Flores De Otero, 426 U.S. 572, 599-600 (1976); Holley v. Lavine, 529 F.2d 1294, 1295 (2d Cir.), cert. denied, 426 U.S. 954 (1976); Immigration Law Service § 27:29 (Alan Jacobs ed., Clark Boardman Callaghan 1994). Section 1983, of Title 42, U.S.C., combined with 28 U.S.C. § 1343(3), affords aliens within the United States access to federal courts to assert claims for violations of the due process and equal protection clauses of the United States Constitution. Bolanos v. Kiley, 509 F.2d 1023 (2d Cir. 1975). This Circuit has held that civil rights class actions may be brought by aliens challenging the alleged denial of civil rights, provided the class description is sufficiently definite and the class has some connection with the claim being litigated. Jagnandan v. Giles, 379 F. Supp. 1178 (N.D. Miss. 1974), aff'd. in part, 538 F.2d 1166 (5th Cir. 1976), cert. denied, 432 U.S. 910 (1977).

A petition alleging that a plaintiff has been damaged by violations of his federal constitutional rights by a federal agent acting under color of federal authority gives rise to a federal

-23-

cause of action for money damages for any injuries the plaintiff has suffered as a result of the agent's constitutional violation. Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 396 (1971) (Fourth Amendment violation); Davis v. Passman, 442 U.S. 228, 245 (1979) (Fifth Amendment violation); Carlson v. Green, 446 U.S. 14, 18 (1980) (Eighth Amendment violation). "[T]he decision in Bivens established that a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978). It is clear that a district court has jurisdiction under 28 U.S.C. § 1331(a) to consider such a constitutional claim by a petitioner. Davis, 442 U.S. at 236 (citing Bell v. Hood, 327 U.S. 678 (1946)).

In determining whether a cause of action may be implied directly under a provision of the United States Constitution, it is error to apply the criteria enunciated by the Supreme Court for ascertaining whether a private cause of action may be implied from a statute not expressly providing one. Id. at 240. "[T]he question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a right that is protected by the Constitution." Id. (emphasis in original). At least in the absence of a "textually demonstrable constitutional commitment of an issue to a coordinate political department," it is

-24-

presumed that justiciable constitutional rights are to be enforced through the courts.  Id. at 242.  Further, the class of those litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights. Id.

The inquiry of whether money damages is an appropriate form of relief under such a cause of action  must be approached on the basis of the established principles of law.  Davis, 442 U.S. at 245.  Federal courts may use any available remedy to make good the wrong done, where legal rights have been invaded and a federal statute provides for a general right to sue for such invasion.  Id. (citing Bell v. Hood, 327 U.S. 678, 684 (1946)).  Thus, federal courts have the authority to provide redress for constitutional violations in the form of an action for money damages, except that the exercise of that authority may not be appropriate where Congress has created another remedy that it regards as equally effective, or where "special factors counse[l] hesitation  [even] in the absence of affirmative action by Congress." Bivens, 403 U.S. at 396-97; see Schweiker, 487 U.S. at 435 (Brennan, J., dissenting).

In the present case, as in Bivens, Davis v. Passman,  and Carlson v. Green, it is appropriate for the federal courts to exercise their authority to provide redress for constitutional

-25-

violations in the form of an action for money damages. Congress has not created another remedy that it regards as equally effective, and there are no "special factors [that] counse[l] hesitation [even] in the absence of affirmative action by Congress." Bivens, 403 U.S. at 396-97. The context of the present case is quite dissimilar to those few instances in which the Supreme Court has refused to recognize a Bivens action to redress constitutional wrongs because "the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration." Schweiker, 487 U.S. at 423.

In Chappell v. Wallace, 462 U.S. 296, 302 (1983), the Court declined to permit an action for damages by enlisted military personnel seeking redress from their superior officers for constitutional injuries, noting that Congress, in the exercise of its "plenary constitutional authority over the military, has enacted statutes regulating military life, and has established a comprehensive internal system of justice to regulate military life . . . . The resulting system provides for the review and remedy of complaints and grievances such as [the equal protection claim] presented by respondents." That system allowed military personnel to raise constitutional challenges in administrative proceedings and authorized recovery of significant consequential damages, such as retroactive promotions. Id. at 303. In Bush v. Lucas, 462 U.S. 367, 385 (1983), the Court concluded that, in light of the

"elaborate, comprehensive scheme" governing federal employment relations, recognition of any supplemental judicial remedy for constitutional wrongs was inappropriate. Under that scheme, constitutional challenges are fully cognizable and prevailing employees are entitled to full backpay, retroactive promotions, seniority, pay raises, and accumulated leave. Id. at 386. Congress expressly "intended [to] put the employee 'in the same position he would have been in had the unjustified or erroneous personnel action not taken place.'" Id. at 388 (quoting S. Rep. No. 1062, 89th Cong. 2d Sess., 1 (1966)). Similarly, in Schweiker, the Court decided that the improper denial of individuals' Social Security disability benefits, allegedly resulting from Fifth Amendment due process violations by government officials administering the program, did not give rise to an action for money damages, noting that the "claims are handled under 'an unusually protective [multi]-step process for the review and adjudication of disputed claims,'" Schweiker, 487 U.S. at 424 (quoting Heckler v. Day, 467 U.S. 104, 106 (1984)), "[o]nce these elaborate administrative remedies [are] exhausted, a claimant [may] seek judicial review, including review of constitutional claims," id., and "the system for protecting [claimants'] rights is, if anything, considerably more elaborate than the civil service system considered in Bush." Id. at 425.

In the present context, Congress has not created an alternate remedy or special administrative program affording constitutional

-27-

protection to aliens, as distinguished from the protection available to ordinary citizens, against injuries caused by the violation of aliens' constitutional rights by federal agents. Nor can it be said that there is any government program suggesting by its design that Congress has provided what a reasonable legislator would consider to be adequate remedial mechanisms for constitutional violations. Consequently, I believe that Humphries' complaint states a cause of action for money damages under the First, Fifth and Thirteenth Amendments that would entitle him to recover for any injuries that he suffered as a result of the federal agents' alleged violations of those Amendments.

The IIRIRA does not divest the district court of jurisdiction of any of Humphries' Bivens causes of action for money damages arising from the alleged violation of his constitutional rights. The Supreme Court has emphatically stated "that where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." Webster v. Doe, 486 U.S. 592, 603 (1988) (citing Johnson v. Robinson, 415 U.S. 361, 373-74 (1974)("'[C]lear and convincing' evidence of congressional intent [is] required by this Court before a statute will be construed to restrict access to judicial review.")). The Court noted that it had reaffirmed that view in Weinberger v. Salfi, 422 U.S. 749 (1975), and declared that "[w]e require this heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial

forum for a colorable constitutional claim." <u>Webster</u>, 486 U.S. at 603 (citing <u>Bowen v. Michigan Academy of Family Physicians</u>, 476 U.S. 667 (1986)).

The government's brief in <u>Reno v. American-Arab Anti-Discrimination Committee</u>, No. 97-1252, in the Supreme Court concedes that a grave constitutional question would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim. Brief for Petitioners, at 36-37 (citing <u>Webster v. Doe</u>, 486 U.S. 592, 603 (1988)). Accordingly, the government also concedes that the respondent aliens' First Amendment selective enforcement challenges are not permanently foreclosed by the IIRIRA. Rather, it is the government's position that such claims can be raised if and when a final order of deportation is entered. <u>Id.</u> at 34. Consequently, the IIRIRA certainly does not foreclose Humphries' <u>Bivens</u> causes of action for money damages based on alleged violations of the First, Fifth and Thirteenth Amendments. Not only has a final order of deportation been entered and carried out removing Humphries to Kenya; his claim does not and could not directly challenge the validity of the removal order or the deportation. Humphries' money damages claim merely seeks compensation for injuries resulting from the alleged constitutional violations.

Accordingly, § 1252(g) of 8 U.S.C. may not be read to deny an alien a judicial forum for a colorable constitutional claim for money damages under <u>Bivens</u> based on the violation of the alien's

-29-

constitutional rights by federal agents acting under color of federal law. The IIRIRA is designed to "enable the prompt admission of those who are entitled to be admitted, the prompt exclusion or removal of those who are not so entitled, and [make] the clear distinction between these categories." Report of the Committee on the Judiciary, House of Representatives on H.R. 2202, Rept. 104-469; 104th Congress at p.111. Section 1252(g) furthers these goals by removing from courts the jurisdiction of a cause or claim arising from the Attorney General's commencement or prosecution of removal proceedings and execution of a removal order until the order has become final. Humphries' <u>Bivens</u> causes of action for money damages arise directly from alleged violations of the Constitution, not from the statutorily authorized removal proceedings against Humphries initiated by the Attorney General. And the removal order deporting Humphries to Kenya has become final, definitive, and has been carried out. Humphries' actions for damages based on violations of his constitutional rights are not affected by and can have no effect upon the definitively final removal order or Humphries' deportation. Nothing in § 1252(g) is persuasive that Congress clearly intended to divest federal courts of jurisdiction of <u>Bivens</u> actions for money damages arising out of the unconstitutional conduct of federal agents acting under color of federal law.

Because Humphries' claim of equitable relief in the form of an injunction of his removal was rendered moot by the final removal

-30-

order and his departure from the United States, there are available no other alternative forms of judicial relief. "For [Humphries], as for Bivens, 'it is damages or nothing.'" Davis, 442 U.S. at 245 (quoting Bivens, 403 U.S. at 410 (Harlan, J., concurring in judgment)). A different case presenting a viable claim for injunctive or other equitable relief based directly on an alleged constitutional violation may call for different treatment of that particular claim. In the case of an alien subjected to the threat or imposition of unconstitutional custodial detention, perhaps a Bivens action for injunctive relief would not be appropriate because of an available alternative remedy of habeas corpus. The question of the appropriateness of habeas corpus or of equitable relief in the form of an injunction against removal is not in this case, however, and we consequently should intimate no final or definitive view on those issues.

I respectfully disagree with the majority's position that Humphries' action for money damages based on the alleged violation of the First Amendment should reach a different fate than his Fifth or Thirteenth Amendment claim. If Humphries can prove that the defendant federal agents' violations of the First Amendment caused him injury by violating his First Amendment rights, he is entitled to recover money damages from them, unless they are entitled to qualified immunity under the applicable facts and law. Today we should be more aware than ever that:

Our system of jurisprudence rests on the assumption that

all individuals, whatever their position in government, are subject to federal law:  "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity.  All officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it."  United States v. Lee, 106 U.S. [196], 220, [27 L. Ed. 171, 1 S. Ct. 240][(1882)].

Davis, 442 U.S. at 246 (quoting Butz v. Economou, 438 U.S. at 506).

I see no reason why the federal official defendants in the present case have a better claim to a jurisdictional defense to a Bivens action for money damages than a president, congressman, cabinet member, or any other federal officer.  As Justice Brennan observed in his dissenting opinion in Schweiker, 487 U.S. at 447:

[I]n order to prevail in any Bivens action, [claimants] must both prove a deliberate abuse of governmental power rather than mere negligence, . . . and overcome the defense of qualified immunity. []Indeed, these very requirements are designed to protect Government officials from liability for their "legitimate" actions; the prospect of liability for deliberate violations of known constitutional rights, therefore, will not dissuade well-intentioned civil servants either from accepting such employment or from carrying out the legitimate duties that employment imposes. (Footnote and citations

-32-

omitted).

This correct observation applies fully to the protection afforded the government officials in the present case as well.