Nolberta AQUILAR, et al.

v.

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION OF THE DEPARTMENT OF HOMELAND SECURITY; Julie L. Myers, Assistant Secretary of Homeland Security for Immigration and Customs Enforcement; Bruce Chadbourne, Field Office Director for Detention and Removal, Boston Field Office, Immigration and Customs Enforcement; Michael Chertoff, Secretary, Department of Homeland Security; and Alberto Gonzales, Attorney General of the United States.

Civil Action No. 07–10471–RGS.

United States District Court, D. Massachusetts.

May 7, 2007.

---

Bernard J. Bonn, III, Dechert, LLP, Harvey Kaplan, Kaplan, O'Sullivan & Friedman Matthew M. Lyons, Michael S. Shin, Dechert LLP, John Reinstein, Laura Rotolo, American Civil Liberties Union, Boston, MA, John Reinstein, American Civil Liberties Union, Boston, MA, for Petitioners.

Frank Crowley, Immigration and Customs Enforcement, Dept. of Homeland Secur, Mark J. Grady, United States Attorney's Office, Barbara Healy Smith, United States Attorney's Office, John Joseph, Moakley Federal Courthouse, Boston, MA, for Respondents.

### ORDER ON MOTION TO DISMISS

STEARNS, District Judge.

On March 6, 2007, agents of the United States Immigration and Customs Enforcement Division (ICE) of the Department of Homeland Security (DHS) arrested several hundred undocumented aliens who were employed at Michael Bianco, Inc. (Bianco), a leather goods factory in New Bedford, Massachusetts.[1] Most of those detained were taken to a holding facility at Ft. Devens in Ayer, Massachusetts. Within forty-eight hours, 210 of the detainees were flown from Massachusetts to detention centers in Harlingen and El Paso, Texas.

On March 8, 2007, Carlos Enrique Avila Sandoval, the Consul General of Guatemala, acting as "next friend" of the detainees, filed a petition for writ of habeas corpus seeking a temporary restraining order (TRO) halting any further transfers of the detainees.[2] The Complaint asserted violations of the detainees' rights under United States laws and the Constitution. The Complaint also alleged that the transfers to holding centers in remote areas of Texas impeded the detainees' right of access to counsel and opportunity to obtain conditional release on bond. Respondents now move to dismiss the case for lack of subject matter jurisdiction.

### BACKGROUND

On March 6, 2007, hundreds of ICE agents took part in "Operation United Front" in New Bedford, Massachusetts. Their target was Bianco, a Department of Defense subcontractor alleged to employ large numbers of illegal immigrants. The agents executed a search warrant and arrested five Bianco managers for violations of the immigration laws. During the sweep, some 360 Bianco employees were taken into custody. Dozens were quickly released when they were determined to be minors or lawful residents of the United States. The remainder were transported to Ft. Devens.

Complications quickly arose. In planning the sweep, ICE "took steps to determine whether arrestees had minor dependents" and had asked the assistance of the Massachusetts Department of Social Services (DSS) in "address[ing] any issues of unattended children." [3] The coordination with DSS, however, proved inadequate. DSS caseworkers who arrived at Ft. De-

---

1. ICE is the largest investigative arm of DHS. Through ICE, DHS enforces the Immigration and Nationality Act (INA).

2. The Amended Complaint lists by name 178 detainees who seek standing as co-plaintiffs.

3. Thirty-five detainees were released immediately after ICE determined that they had "pressing humanitarian needs, such as being a sole caregiver or illness."

vens on the evening of March 7, 2007, were initially denied access to the detainees.[4] They were permitted to interview those detainees who had requested DSS intervention only after a group of ninety detainees had been flown to an ICE Detention and Removal Operations (DRO) center in Harlingen, Texas.[5] Caseworkers were eventually able to interview forty detainees. DSS requested that twenty-six of these detainees be released because of child care issues or medical complications.[6]

Shortly after 4:00 p.m. on the afternoon of March 8, 2007, Sandoval filed this action. He requested an emergency hearing on the motion for a TRO. Approximately an hour after the lawsuit was filed, a group of 116 detainees was flown to a DRO holding facility in El Paso, Texas.[7] This court convened a hearing on Sandoval's motion at 5:45 p.m. Counsel for the government agreed that no further transfers would take place before a hearing scheduled by the court for noon the following day.

At the March 9, 2007 hearing, the court heard testimony from Susan Getman, a DSS Deputy Commissioner, regarding the logistical difficulties and failed communications that had resulted in some minor children being stranded without adult supervision. She also testified about DSS's frustration at the lack of adequate warning and an opportunity to investigate the detainees' needs. Petitioners' counsel accused ICE of transferring the detainees to Texas as part of a deliberate strategy to defeat the jurisdiction of the court, to deny access to counsel, and to make it more difficult for the detainees to obtain release on bond. Respondents argued that the detainees had been transferred from Massachusetts because of a shortage of bed space. They also contended that the detainees would receive the same procedural protections in immigration proceedings in Texas as they would in Massachusetts.[8]

Immediately after the hearing, the court issued a TRO barring any further out-of-state transfers without prior notice to the court.[9] The court ordered that no undue restrictions be placed on the detainees' access to counsel. The court also directed ICE and DSS to work collaboratively to resolve any remaining issues involving unattended minor children and to file a

---

4. Earlier that day, a group of volunteer lawyers, law students, and paralegals who volunteered their services to the detainees were also turned away from Ft. Devens. The following day they were permitted to meet with thirty detainees who had requested legal advice.

5. The group of detainees was comprised of sixty-four Guatemalans, fifteen Hondurans, six Brazilians, three Cape Verdeans, and two Mexican citizens. The following morning, three juvenile detainees were flown to Miami, Florida, and one "adult and juvenile family unit" was taken to Leesport, Pennsylvania.

6. Twenty-one of the twenty-six detainees on whose behalf DSS interceded were released by ICE over the next two days.

7. This group of detainees consisted of eighty-eight Guatemalans, twenty-two Hondurans, three Mexicans, one Portuguese, and one Ecuadorian.

8. On March 13, 2007, as part of the court-ordered Status Report, respondents submitted an affidavit of Robert Jolicoeur, the ICE Field Office Director in El Paso. According to Jolicouer, the 116 detainees transferred from Ft. Devens on March 8, 2007, were provided with written contact information in Spanish and English for the New Bedford DSS office. Jolicoeur also stated that he had attended a briefing (conducted in Spanish), during which the detainees were asked for assistance in verifying whether their minor children were being cared for by an adult. The detainees were also asked if they had legal counsel and were given a list of three local legal service providers and free telephone use.

9. Ninety detainees were still being held in Massachusetts.

Status Report with the court on or before March 13, 2007.[10] The court then entered a briefing schedule limited to the issue of its jurisdiction.

On March 13, 2007, petitioners filed the Amended Class Petition. On March 16, 2007, petitioners filed an emergency motion asking that the court enjoin all removal proceedings in Texas pending a resolution of the jurisdictional issues. The court held a hearing on the motion that afternoon. At the hearing, respondents represented that ICE intended to remove only those aliens who were the subject of final removal orders entered prior to March 6, 2007. Consequently, the court denied petitioners' request for a TRO.[11]

The court held a status conference on March 21, 2007. Petitioners requested leave to conduct limited discovery on jurisdictional issues. The court permitted petitioners to take the deposition of Bruce Chadbourne on an expedited basis and scheduled a hearing and briefing schedule on respondents' motion to dismiss.[12]

On March 23, 2007, respondents filed a notice of their intent to deport detainees otherwise covered by the court's TRO who had agreed to voluntary deportation after waiving their right to appeal a final order of removal. On March 28, 2007, petitioners moved for a TRO seeking to enjoin

respondents from executing final removal orders for any of these detainees. Petitioners maintained that many of the detainees who had agreed to voluntary removal had been intimidated or coerced into waiving their right to a full hearing. On April 6, 2007, the court heard argument on the motion as well as on a motion filed by petitioners for additional discovery "to establish habeas jurisdiction over the Plaintiffs in detention in Port Isabel/Harlingen, Texas." At the conclusion of the hearing, the court ordered respondents to provide petitioners' counsel with the identities and locations of the detainees scheduled for voluntary removal and to permit petitioners' counsel to meet with any detainees who wished to consult an attorney regarding his or her legal rights.

On April 19, 2007, the court held a hearing on respondents' motion to dismiss, petitioners' motion for further discovery, and petitioners' request that the April 6, 2007 TRO be extended pending the court's ruling on the motion to dismiss. Petitioners' counsel also reported that pursuant to the court's order of April 6, 2007, they had interviewed seventy-five detainees in Texas whom ICE had identified as having agreed to voluntary removal. Of these detainees, fifty-four stated that they had not knowingly and voluntarily waived their

---

**10.** On March 10, 2007, despite some initial friction, DSS caseworkers sent from Massachusetts were permitted to meet with the Texas detainees to explore outstanding child care and medical issues. Following the interviews, DSS recommended the release of eleven detainees; ICE released three for "humanitarian" reasons. On Sunday, March 11, 2007, DSS provided ICE with the names of an additional thirty-two detainees who were recommended for release. DSS also gave ICE the names of thirty-four detainees who had requested legal assistance. On March 12, 2007, ICE agreed to release nine of the Texas detainees. (DSS withdrew two requests). ICE also promised that it would continue to review the requests. The following day, March

13, 2007, additional releases took place and another request was withdrawn, although at least four cases remained in dispute.

**11.** Sixty-six detainees (fifty being held in Massachusetts, ten in El Paso, and six in Harlingen) were affected.

**12.** Despite the order limiting discovery to the expedited deposition of Chadbourne, petitioners issued Rule 30(b)(6) deposition notices to ICE, DHS, DSS, and the Department of Justice. On April 2, 2007, respondents moved to quash. On April 3, 2007, the court allowed the motion. In response, on April 4, 2007, petitioners filed a motion seeking additional jurisdictional discovery.

rights. At the conclusion of the hearing, the court entered an order staying the removal of any of the non-Massachusetts detainees who now wished to contest deportation.[13] On May 2, 2007, the parties completed the briefing schedule on the motion to dismiss for want of subject matter jurisdiction. The motion is now ripe.

### DISCUSSION

Petitioners fall into three classes: (1) the ninety detainees who were transported to Harlingen, Texas, before the lawsuit was filed;[14] (2) the 116 detainees who were moved to El Paso, Texas, after the filing of the suit;[15] and (3) the ninety detainees who remained in Massachusetts after the court issued the TRO halting any further transfers. Although the Amended Complaint is broadly framed, the immediate relief sought affects only the first two classes of detainees. It is important to a resolution of the instant motion to understand precisely what is being claimed by both sides. That in turn requires a brief explication of recent amendments to the INA stripping the courts of jurisdiction to review enforcement actions undertaken by the Attorney General.

In 2005, Congress—frustrated by persistent delays resulting from legal challenges to orders of removal—passed the REAL ID Act (RIDA), Pub.L. No. 109–13, Div. B., 119 Stat. 302 (2005). RIDA limits the habeas jurisdiction of the district courts in immigration cases. It also strips the courts of subject matter jurisdiction over certain discretionary decisions of the Attorney General and the Secretary of DHS.[16] Under RIDA, the Courts of Appeals now have original subject matter jurisdiction over "all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States," and respecting "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this [INA]." 8 U.S.C. §§ 1252(b)(9)[17] and 1252(g).[18]

---

**13.** The stay as originally entered was of twelve days' duration. On May 2, 2007, the court extended the stay at petitioners' request pending issuance of this opinion.

**14.** As to this group of detainees, the court lacks *in personam* jurisdiction over their "immediate custodian," the Director of the DRO center in Harlingen, Texas. *See Rumsfeld v. Padilla,* 542 U.S. 426, 439, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004) ("[T]he immediate custodian, not a supervisory official who exercises legal control, is the proper respondent.").

**15.** As to this group, respondents concede that the court retains *in personam* jurisdiction.

**16.** RIDA specifically excepted challenges to matters involving "pure" detention from its divestiture of district court habeas jurisdictions. *See Hernandez v. Gonzales,* 424 F.3d 42, 42–43 (1 st Cir.2005). Petitioners do not, however, contest the legality of their arrests and detention.

**17.** As amended by RIDA, section 1252(b)(9) reads:

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28, or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

**18.** Section 1252(g) reads:

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including sec-

RIDA further amended section 1252(a)(2)(B) to read as follows.

> Notwithstanding any other provision of law (statutory or otherwise) . . . and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—
>
> .    .    .    .    .
>
> (ii) any . . . decision or action of the Attorney General of the Secretary of Homeland Security the authority for which is specified under [U.S.C. §§ 1151–1381] to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under [certain asylum provisions].

8 U.S.C. § 1252(a)(2)(B). Among these discretionary decisions is the determination whether to grant bond or parole, 8 U.S.C. § 1226(e),[19] and the selection by the Attorney General of "appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). *See Rios–Berrios v. INS,* 776 F.2d 859, 863 (9th Cir.1985).[20]

Sensitive to these restrictions on the jurisdiction of the district court to review their statutory and constitutional claims, petitioners have recharacterized the claims as alleging a collective denial of secured rights that are incidental to, rather than an integral part of, the removal process.

Because the amendments to the INA made by RIDA apply only to challenges to removal orders, they unquestionably do not strip this Court of jurisdiction over this case. Petitioners' claims do not involve challenges to removal orders but rather concern the violation of their statutory and constitutional rights caused by the pattern and practice of Respondents' deliberate conduct concerning Petitioners' transfer to and detention in Texas. Specifically, Petitioners allege, inter alia: that Respondents seized Petitioners with the intention of promptly transferring them to isolated locations where Respondents knew, or should have known, that Petitioners could not effectively exercise their rights, (Am. Compl. at ¶ 10), that during Petitioners' detention in Fort Devens Respondents restricted access to counsel, (*id.* at ¶ ¶ 14–16), that Respondents did not coordinate with the Department of Social Services to assess and address issues concerning the welfare of Petitioners' children and families and allow Petitioners to make meaningful decisions concerning the care of their children, (*id.* at ¶ ¶ 22–25, 49, 51), that Respondents' *en masse* transfer of Petitioners to remote locations in Texas

---

tion 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.
8 U.S.C. § 1252(g). *See also* 8 U.S.C. § 1252(a)(2)(D).

**19.** Section 1226(e) reads: "The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this

section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole."

**20.** Petitioners argue that the word "appropriate" implies something less than the investing of "pure" discretion in the Attorney General and therefore provides an opening for judicial review. While circumstances might be envisioned in which the Attorney General's decision was so lacking in rationality as to invite judicial intervention, one would think that courts are ordinarily not well equipped to make decisions about the allocation of bed space in the immigration system. *See Van Dinh v. Reno,* 197 F.3d 427, 433 (10th Cir. 1999).

has resulted in their inability to retain counsel, and certainly counsel of their choice, (id. at ¶¶ 20, 26, 49), that Petitioners' restricted access to counsel has prevented them from obtaining advice concerning potential grounds for asylum or other forms of relief (id. at ¶¶ 14, 28), and that the transfer [of] Petitioners to Texas has severely prejudiced their ability to demonstrate ties to the community and otherwise present evidence on their behalf in bond hearings. (Id. at ¶ 50).

Petitioners' Sur–Reply, at 8–9.

Assuming these allegations to be true, the Amended Complaint fails to link respondents' "pattern and practice" to any constitutional or statutory violation that is ripe for review.[21] There is no Sixth Amendment right to counsel in a removal proceeding. Lozada v. INS, 857 F.2d 10, 13 (1st Cir.1997). The "privilege" is rather a statutory one permitting a detainee to retain counsel at his or her own expense. 8 U.S.C. § 1229a(b)(4)(A). There is also no constitutional right to release on bond while removal proceedings are pending. Demore v. Kim, 538 U.S. 510, 523, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). Nor do petitioners cite, nor is the court aware of, any constitutional right to have a removal hearing held in a specific venue. Cf. Vasquez, 233 F.3d at 696 ("categorically" rejecting the proposition that a "more favorable legal climate" in the First Circuit constituted an extraordinary circumstance justifying a change of venue). The Amended Complaint, in other words, fails to identify any constitutional right inhering to petitioners as a class that would justify the extraordinary relief that they seek—an order directing that they be returned as a group to Massachusetts for removal proceedings.

This is not to say that petitioners have no rights. They are entitled to certain enumerated statutory protections, as well as to the due process guaranteed by the Fifth Amendment. These rights, however, are personal to the petitioners. If protected rights have been, or will be, violated in the removal proceedings underway in Texas, individual petitioners are required by law to exhaust their administrative remedies by presenting their claims to the Board of Immigration Appeals, and, if relief is denied, to the appropriate Court of Appeals, as Congress has willed it. See 8 U.S.C. §§ 1252(d)(1) and 1252(b)(9). See also Bernal–Vallejo v. INS, 195 F.3d 56, 64 (1st Cir.1999) (affirming the exhaustion requirement with respect to due process claims); Sayyah v. Farquharson, 382 F.3d 20, 28 (1st Cir.2004) (affirming the authority of the BIA to correct errors in immigration court proceedings).

## ORDER

For the foregoing reasons, respondents' motion to dismiss is ALLOWED as the district court lacks subject matter jurisdiction.[22] The stay of removals entered on

21. The court is not persuaded by the petitioners' attempt to recast the bulk of their claims as something other than a challenge to the removal proceedings (a matter which, as petitioners concede, is vested exclusively in the Courts of Appeals). The heart of the Amended Complaint is addressed to alleged violations of the petitioners' rights resulting from the manner in which the removal process is being conducted in their individual and collective circumstances.

22. The court is not persuaded otherwise by the two supplemental cases submitted by petitioners after the close of briefing, Nnadika v. Attorney General, 484 F.3d 626, (3rd Cir. 2007), and Royal Siam Corp. v. Chertoff, 484 F.3d 139, (1st Cir.2007). In Nnadika, the Third Circuit Court of Appeals remanded so much of the transferred case as involved the refusal of the Attorney General to grant an I–730 asylee petition with instructions that the district court consider the government's argument that review was barred by 8 U.S.C. § 1252(a)(2)(B)(ii). In Royal Siam, a case

May 2, 2007, will be *EXTENDED* for twenty-one (21) days to permit petitioners to seek a further enlargement of the stay from the Court of Appeals.

SO ORDERED.

involving the refusal to grant an H–1 B visa petition, the First Circuit, while noting that "the jurisdiction-stripping provisions of section 1252 apply outside the removal context," found it prudential to bypass the jurisdictional question given the lack of merit to the appeal.