# United States Court of Appeals
## For the First Circuit

No. 07-1819

NOLBERTA AGUILAR ET AL.,

Petitioners, Appellants,

v.

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION
OF THE DEPARTMENT OF HOMELAND SECURITY ET AL.,

Respondents, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Richard G. Stearns, U.S. District Judge]

Before

Boudin, Chief Judge,
Selya, Senior Circuit Judge,
and Howard, Circuit Judge.

Bernard J. Bonn, III and Harvey Kaplan, with whom Michael Shin, Matthew M. Lyons, Dechert LLP, Kaplan, O'Sullivan & Friedman, Nancy Kelly, John Willshire, Greater Boston Legal Servs., John Reinstein, Laura Rótolo, American Civil Liberties Foundation of Mass., Iris Gomez, Mass. Law Reform Inst., Ondine Sniffin, and Catholic Social Servs. of Fall River were on brief, for petitioners.

Thomas H. Dupree, Jr., Deputy Assistant Attorney General, with whom Peter D. Keisler, Assistant Attorney General, Daniel J. Davis, Counsel to the Assistant Attorney General, David J. Kline, Principal Deputy Director, Office of Immigration Litigation, Elizabeth J. Stevens, Attorney, Office of Immigration Litigation, Michael J. Sullivan, United States Attorney, and Mark Grady, Assistant United States Attorney, were on brief, for respondents.

November 27, 2007

**SELYA**, <u>Senior Circuit Judge</u>.  This appeal has its genesis in a dramatic raid on a leather goods factory in New Bedford, Massachusetts.  Enforcement of the immigration laws is difficult and oftentimes controversial work.  So it was here: the raid led to the detention of hundreds of undocumented aliens and put significant strains on those involved and those who wished to help.  In short order, the detainees (many of whom were whisked away to distant places) brought a civil action alleging abridgement of a constellation of constitutional and statutory rights.

Confronted with a maze of issues, the district court patiently sorted through them and, in a thoughtful rescript, eventually dismissed the action for want of subject matter jurisdiction.  <u>Aguilar</u> v. <u>U.S. Immigr. & Customs Enf. Div. of Dep't of Homeland Sec.</u>, 490 F. Supp. 2d 42, 48 (D. Mass. 2007).  The detainees (whom we sometimes shall refer to as "the petitioners") now challenge that ukase.  Their appeal raises novel and important questions concerning the scope, reach, and interpretation of the immigration laws.  In particular, it requires us to disentangle the Gordian knot of jurisdictional provisions created by recent amendments to the Immigration and Nationality Act (INA).

We discern no simple, one-size-fits-all answer to the questions presented by the parties.  After careful perscrutation of a scumbled record, we conclude that some of the petitioners' claims are unpreserved, some are subject to a jurisdictional bar, and

others are simply not actionable. The common denominator is that none of the claims can proceed in the district court. Thus, while our reasoning differs somewhat from that of the court below — and our opinion should not be read as an unqualified endorsement of the way in which immigration officials handled the matter — we affirm the judgment of dismissal. The tale follows.

## I.

We rehearse here only those facts needed to place this appeal in workable perspective. On March 6, 2007, federal officers conducted a raid as part of "Operation United Front." The raid targeted Michael Bianco, Inc., a Department of Defense contractor suspected of employing large numbers of illegal aliens. Immigration and Customs Enforcement (ICE) agents, armed with search and arrest warrants, appeared unannounced at the factory, arrested five executives on immigration-related criminal charges, and took more than 300 rank-and-file employees into custody for civil immigration infractions. The ICE agents cast a wide net and paid little attention to the detainees' individual or family circumstances.

The government's subsequent actions regarding the undocumented workers who were swept up in the net lie at the epicenter of this litigation. After releasing dozens of employees determined either to be minors or to be legally residing in the United States, ICE transported the remaining detainees to Fort

Devens (a holding facility in Ayer, Massachusetts). Citing a shortage of available bed space in Massachusetts, ICE then began transferring substantial numbers of aliens to faraway detention and removal operations centers (DROs). For example, on March 7, 90 detainees were flown to a DRO in Harlingen, Texas, and the next day 116 more were flown to a DRO in El Paso, Texas.

ICE attempted to coordinate its maneuvers with the Massachusetts Department of Social Services (DSS) to ensure the proper care of family members. It took steps to address concerns about child welfare and released several detainees for humanitarian reasons. Still, the petitioners allege (and, for present purposes, we accept) that ICE gave social welfare agencies insufficient notice of the raid, that caseworkers were denied access to detainees until after the first group had been transferred, and that various ICE actions temporarily thwarted any effective investigation into the detainees' needs. As a result, a substantial number of the detainees' minor children were left for varying periods of time without adult supervision.

With respect to the detainees themselves, the petitioners aver that ICE inhibited their exercise of the right to counsel. According to the petitioners, a squad of volunteer lawyers who had offered to provide the detainees with guidance was turned away from Fort Devens on March 7. The next day, the lawyers were allowed to meet with those detainees (some thirty in number) who had expressly

-4-

requested legal advice. The petitioners allege that, notwithstanding this largesse, some detainees were denied access to counsel after they arrived in Texas.

On the afternoon of March 8, the Guatemalan consul, acting as next friend of the detainees (many of whom were Guatemalan nationals), filed a petition for a writ of habeas corpus and a complaint for declaratory and injunctive relief in the United States District Court for the District of Massachusetts. The action sought the detainees' immediate release or, in the alternative, a temporary restraining order halting further transfers. The district court enjoined ICE from moving any of the remaining detainees out of Massachusetts pending further order of the court.

On March 13, the plaintiffs filed an amended complaint, fashioned as a class action, and withdrew their plea for immediate release. The amended complaint named ICE and various other federal agencies and actors as respondents (for ease in exposition, we sometimes refer to the defendants, collectively, as "ICE" or "the government"). In that pleading, the petitioners alleged that ICE's actions had violated certain of the petitioners' constitutional and statutory rights, including: (i) the right to be free from arbitrary, prolonged, and indefinite detention; (ii) the right to a prompt bond hearing, that is, one held in Massachusetts prior to any transfer; (iii) the right to counsel; and (iv) the right of

family integrity.  The amended complaint further alleged that it was "the established policy and practice of the [government] to conduct large scale 'sweeps' or 'raids' in which large numbers of persons suspected of being unlawfully present in the United States" are held "at facilities which are some distance from the site of arrest and under conditions where access to counsel . . . is impracticable, if not impossible."

On March 16, the government filed an omnibus motion to dismiss for want of personal and subject matter jurisdiction and for failure to state any claim upon which relief might be granted. In due course, the district court allowed the motion to dismiss on the ground that it lacked subject matter jurisdiction.  Aguilar, 490 F. Supp. 2d at 48.  The court also dissolved the temporary restraining order that it previously had issued.

The linchpin of the lower court's decision was its conclusion that the INA, as amended by the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 302, stripped it of both habeas and federal question jurisdiction to hear the petitioners' claims. Aguilar, 490 F. Supp. 2d at 46, 48 (citing 8 U.S.C. § 1252(b)(9)); id. at 47-48 (citing 8 U.S.C. § 1252(a)(2)(B)(ii)).  In its rescript, the court rejected the petitioners' attempted re-characterization of their remonstrances as pattern and practice claims, that is, claims alleging a collective denial of rights collateral to removal proceedings.  Id. at 48.  In that regard, the

court concluded that the petitioners had failed to link these class-wide pattern and practice claims to any specific constitutional violation that might be ripe for review. Id.

The district court paid special heed to the absence of any Sixth Amendment right to counsel in removal proceedings, the absence of any constitutional right to release on bond, and the absence of any constitutional right to have a removal proceeding held in a particular venue. Id. And while acknowledging that the petitioners were entitled to the due process guarantees of the Fifth Amendment as well as to certain statutory protections, the district court concluded that those rights were personal to the petitioners and, as such, had to be exhausted administratively before the courts could become involved. Id.

This timely appeal ensued. In it, the petitioners assign error to the lower court's conclusion that it lacked subject matter jurisdiction over their claims and relatedly, to its conclusion that the petitioners are only entitled to judicial review on an individualized basis after exhausting their administrative remedies. Overall, the petitioners urge us to hold that they have stated cognizable claims that are ripe for judicial review and that their action should, therefore, be allowed to proceed in the district court.

Conscious of our role as a court of limited jurisdiction, we begin our analysis with the multi-part question of whether and to what extent the district court possessed subject matter jurisdiction to hear the petitioners' claims. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998); Bell v. Hood, 327 U.S. 678, 682 (1946). We then turn to the surviving claims.

We review a district court's dismissal for want of subject matter jurisdiction de novo. See, e.g., Dominion Energy Brayton Point, LLC v. Johnson, 443 F.3d 12, 16 (1st Cir. 2006). For that purpose, we give weight to the well-pleaded factual averments in the operative pleading (here, the petitioners' amended complaint) and indulge every reasonable inference in the pleader's favor. See Muñiz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003). Where, however, those facts are illuminated, supplemented, or even contradicted by other materials in the district court record, we need not confine our jurisdictional inquiry to the pleadings, but may consider those other materials.[1] See J.S. ex

---

[1]This seems an appropriate place to mention that, before oral argument in this court, the government moved to supplement the record with copies of orders from immigration judges awarding continuances, changes of venue, and other ancillary relief to several of the petitioners. We grant the motion. Although we generally limit appellate consideration to the record before the district court, this submission comes within an exception to the usual rule because we may take judicial notice of the proffered orders. See, e.g., Fornalik v. Perryman, 223 F.3d 523, 529 (7th

<u>rel. N.S.</u> v. <u>Attica Cent. Sch.</u>, 386 F.3d 107, 110 (2d Cir. 2004); <u>Gonzalez</u> v. <u>United States</u>, 284 F.3d 281, 288 (1st Cir. 2002). Our solution to the jurisdictional puzzle may be original, that is, we may affirm an order of dismissal on any ground made apparent by the record (whether or not relied upon by the lower court). <u>See</u> <u>InterGen N.V.</u> v. <u>Grina</u>, 344 F.3d 134, 141 (1st Cir. 2003).

**A.**

The petitioners contend that the district court possessed subject matter jurisdiction over their claims pursuant to the general grant of federal question jurisdiction, 28 U.S.C. § 1331, and the statutory grant of habeas corpus jurisdiction, <u>id.</u> § 2241. In outlining this contention, they concede that Congress, in enacting 8 U.S.C. § 1252(b)(9), attempted to direct challenges to removal through defined administrative channels. They argue, however, that their claims lie beyond the reach of this channeling statute.

Delineating the precise ambit of section 1252(b)(9) calls for an exercise in statutory construction. Thus, our starting point is the statutory text. <u>See</u> <u>Richardson</u> v. <u>United States</u>, 526

---

Cir. 2000) (taking judicial notice of INS actions); <u>see</u> <u>also</u> Fed. R. Evid. 201 advisory committee note (stating that judicial notice may be taken on appeal). As we explain later in this opinion, the orders are highly relevant to a determination of whether the petitioners have an adequate forum in which to present their claims.

U.S. 813, 816 (1999); Fed. Refin. Co. v. Klock, 352 F.3d 16, 25 (1st Cir. 2003).

Section 1252(b)(9) is entitled "Consolidation of questions for judicial review." It reads in pertinent part:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under Section 2241 of Title 28, or any other habeas corpus provision . . . or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

The Supreme Court has described this provision as a "general jurisdictional limitation" and as "an unmistakable 'zipper' clause." Reno v. Am.-Arab Anti-Discrim. Comm., 525 U.S. 471, 482-83 (1999). By its terms, the provision encompasses "all questions of law and fact" and extends to both "constitutional and statutory" challenges. Its expanse is breathtaking.

Congress's purpose in enacting section 1252(b)(9) is evident. As its text makes manifest, that proviso was designed to consolidate and channel review of all legal and factual questions that arise from the removal of an alien into the administrative process, with judicial review of those decisions vested exclusively in the courts of appeals. See 8 U.S.C. § 1252(a)(5) (ordaining that "a petition for review filed with an appropriate court of

appeals . . . shall be the sole and exclusive means for judicial review of an order of removal").  In enacting section 1252(b)(9), Congress plainly intended to put an end to the scattershot and piecemeal nature of the review process that previously had held sway in regard to removal proceedings.  See H.R. Rep. No. 109-72, at 174 (2005) (Conf. Rep.), reprinted in 2005 U.S.C.C.A.N. 240, 299.

While paying lip service to the breadth and purpose of section 1252(b)(9), the petitioners endeavor to avoid its strictures by reading section 1252(b)(9) narrowly as stripping district courts of jurisdiction over challenges to ongoing removal proceedings — nothing more.  On this basis, the petitioners claim that the district court's habeas jurisdiction remains intact for all legal challenges that are unaccompanied by any challenge to a particular removal proceeding.  That is wishful thinking; as we explain below, such a construct belies the statute's plain meaning and runs contrary to Congress's discernible intent.

Undocumented aliens cannot escape the vise-like grip of section 1252(b)(9) by the simple expedient of banding together claims consigned by law to administrative channels, declining to raise them within the ambit of removal proceedings per se, and maintaining that those unexhausted claims do not implicate a particular removal determination.  The reach of section 1252(b)(9) is not limited to challenges to singular orders of removal or to

removal proceedings simpliciter. By its terms, the provision aims to consolidate "all questions of law and fact" that "arise from" either an "action" or a "proceeding" brought in connection with the removal of an alien. See 8 U.S.C. § 1252(b)(9). Importantly, the statute channels federal court jurisdiction over "such questions of law and fact" to the courts of appeals and explicitly bars all other methods of judicial review, including habeas. Id.

The petitioners cannot skirt the statutory channel markers by lumping together a melange of claims associated with removal, each of which would be jurisdictionally barred if brought alone, and eschewing a direct challenge to any particular removal proceeding. Such claim-splitting — pursuing selected arguments in the district court and leaving others for adjudication in the immigration court — heralds an obvious loss of efficiency and bifurcation of review mechanisms. These are among the principal evils that Congress sought to avoid through the passage of section 1252(b)(9). See H.R. Rep. No. 109-72, at 174, reprinted in 2005 U.S.C.C.A.N. at 299. It is our task to enforce the statute as Congress wrote it, and we reject the petitioners' invitation to read the statute in a way that would frustrate Congress's unmistakable purpose.

In a somewhat related vein, the petitioners insist that the challenged actions occurred prior to the institution of any formal removal proceedings and, thus, are beyond the compass of the

zipper clause. Although their factual premise is unarguably correct, their conclusion is not; nothing in the statute limits its reach to claims arising from extant removal proceedings. Reading the statute to limit the exhaustion requirement to claims that arise from ongoing removal proceedings would put an undue premium on which party rushed to the courthouse first. More importantly, such a reading would render the word "action" superfluous and effectively excise it from the statute. Yet it is a familiar canon of construction that, whenever possible, every word and phrase in a statute should be given effect. See, e.g., United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985). That canon demands our fidelity here.

None of this is to imply that section 1252(b)(9) is limitless in its scope. The words "arising from" do not lend themselves to precise application, see Hiroshi Motomura, Judicial Review in Immigration Cases After AADC: Lessons from Civil Procedure, 14 Geo. Immigr. L.J. 385, 424 (2000), and courts have debated their meaning in other settings, see Humphries v. Various Fed. USINS Employees, 164 F.3d 936, 943 (5th Cir. 1999) (collecting cases). One thing is clear, however: those words are not infinitely elastic. Cf. Louisville & Nashville R.R. v. Mottley, 211 U.S. 149, 152 (1908) (famously reading the analogous term "arising under" more narrowly than plain meaning might suggest). With respect to section 1252(b)(9), these words cannot be read to

-13-

swallow all claims that might somehow touch upon, or be traced to, the government's efforts to remove an alien.

To us, Congress's choice of phrase suggests that it did not intend section 1252(b)(9) to sweep within its scope claims with only a remote or attenuated connection to the removal of an alien. Courts consistently have recognized that the term "arising from" requires more than a weak or tenuous connection to a triggering event. See, e.g., Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 465 U.S. 1, 27 n.32 (1983); Humphries, 164 F.3d at 943; Pizarro v. Hoteles Cocorde Int'l, C.A., 907 F.2d 1256, 1259 (1st Cir. 1990).

Furthermore, if Congress had intended to accomplish so far-reaching a result, it could have used broader language. Cf. McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 496 (1991) (suggesting that if Congress intended a certain provision of the INA to be read more expansively, it could have used more expansive language). For example, Congress would have used the term "related to" instead of "arising from." See Humphries, 164 F.3d at 943 (suggesting that "related to" signifies a somewhat looser nexus than "arising from").

Such a bounded reading of the statute is also suggested by the fact that certain claims are excluded from the sweep of section 1252(b)(9) by virtue of legislative intent and judicial precedent. To illustrate, the legislative history indicates that

-14-

Congress intended to create an exception for claims "independent" of removal. H.R. Rep. No. 109-72, at 175, as reprinted in 2005 U.S.C.C.A.N. at 300. Thus, when it passed the REAL ID Act, Congress stated unequivocally that the channeling provisions of section 1252(b)(9) should not be read to preclude "habeas review over challenges to detention." Id. (indicating that detention claims are "independent of challenges to removal orders"). In line with this prescription, we have held that district courts retain jurisdiction over challenges to the legality of detention in the immigration context. See Hernández v. Gonzales, 424 F.3d 42, 42 (1st Cir. 2005) (holding that detention claims are independent of removal proceedings and, thus, not barred by section 1252(b)(9)). This carve-out seemingly encompasses constitutional challenges regarding the availability of bail. See, e.g., Demore v. Kim, 538 U.S. 510, 516 (2003).

There is no reason to believe that section 1252(b)(9)'s exception for independent claims is restricted to those related to detention. Cf. Sissoko v. Rocha, 440 F.3d 1145, 1156-57 (9th Cir. 2006) (suggesting that the broad jurisdiction-stripping provisions of 8 U.S.C. § 1252(g) do not foreclose aliens' claims for money damages under the doctrine of Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 389 (1971)). After all, section 1252(b)(9) is a judicial channeling provision, not a

-15-

claim-barring one.[2]  The provision, where applicable, only requires exhaustion of administrative procedures and the consolidation of claims for judicial review.

We say "where applicable" because removal proceedings are confined to determining whether a particular alien should be deported.  See id. § 1229a(c)(1)(A).  While legal and factual issues relating to that question can be raised in removal proceedings and eventually brought to the court of appeals for judicial review, certain claims, by reason of the nature of the right asserted, cannot be raised efficaciously within the administrative proceedings delineated in the INA.  See, e.g., McNary, 498 U.S. at 496; Jupiter v. Ashcroft, 396 F.3d 487, 492 (1st Cir. 2005).  Requiring the exhaustion of those claims would foreclose them from any meaningful judicial review.  Given Congress's clear intention to channel, rather than bar, judicial review through the mechanism of section 1252(b)(9), reading "arising from" as used in that statute to encompass those claims would be perverse.

We thus read the words "arising from" in section 1252(b)(9) to exclude claims that are independent of, or wholly

---

[2]Congress knows how to bar claims in the immigration context when it desires to do so.  See, e.g., 8 U.S.C. § 1252(g)(2) (declaring that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders").

-16-

collateral to, the removal process. Among others, claims that cannot effectively be handled through the available administrative process fall within that purview. This reading, we believe, is consistent with the wise presumption that Congress legislates with knowledge of longstanding rules of statutory construction. See McNary, 498 U.S. at 496. That presumption traditionally requires that there be clear and convincing evidence of legislative intent before restricting access to judicial review entirely. See, e.g., Abbott Labs. v. Gardner, 387 U.S. 136, 141 (1967).

This holding fits comfortably with traditional legal principles. Courts long have recognized an exception to the exhaustion requirement for claims that are collateral to administrative proceedings. See, e.g., Bowen v. City of New York, 476 U.S. 467, 482-83 (1986); Mathews v. Eldridge, 424 U.S. 319, 330 (1976). In that regard, courts have been most willing to deem claims "collateral" when requiring exhaustion would "foreclose all meaningful judicial review." Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 212-13 (1994); see Leedom v. Kyne, 358 U.S. 184, 190 (1958) (upholding injunction against agency action when petitioners lacked any other means to protect or enforce their rights).

As a further reflection of this same attitude, courts have demonstrated a particular hostility toward requiring exhaustion when adequate relief could not feasibly be obtained through the prescribed administrative proceedings. See, e.g.,

-17-

Mathews, 424 U.S. at 331. That hostility also manifests itself when a party would be "irreparably injured" by adherence to an exhaustion requirement. Bowen, 476 U.S. at 483.

**B.**

Against this backdrop, we now turn to the question of whether section 1252(b)(9) requires administrative exhaustion of some or all of the petitioners' claims. We deal sequentially with the petitioners' assertions about their constitutional right to be free from harsh and inhumane conditions of confinement, their assertions anent the right to counsel, and their assertions concerning the right to family integrity. We subsume in these discussions the petitioners' attempt to package their offerings as class-wide pattern and practice suits.

We need not linger long over the conditions-of-confinement claims. We assume, for argument's sake, that claims challenging the conditions of an alien's detention are independent of removal proceedings. Cf. Hernández, 424 F.3d at 42 (holding that the REAL ID Act does not bar claims that merely challenge the length of an alien's detention). Here, however, the conditions-of-confinement claims were not raised below. That is a significant omission. "If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal." Teamsters, Chauffeurs, Warehousemen &

Helpers Union, Local No. 59, v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992).

To elaborate, the amended complaint in this case makes no mention either of harsh conditions of confinement or of cruel and inhumane treatment during detention. It only challenges the legality and duration of confinement — and neither of those challenges are renewed on appeal.

Going beyond the pleadings, the lone mention in the district court record of any oppressively harsh conditions of confinement is in an affidavit attached to one of the petitioners' preliminary motions. That cursory reference is insufficient to preserve the issue for appeal. See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988) ("One should not be allowed to defeat the system by seeding the record with mysterious references to unpled claims, hoping to set the stage for an ambush should the ensuing ruling fail to suit."). The petitioners, who could have asked the district court for leave further to amend their complaint, Fed. R. Civ. P. 15(a), have shown no reason — let alone a compelling reason — that would prompt us to relax the prudential rule limiting appellate consideration to issues that were squarely raised below. The conditions-of-

confinement claims are, therefore, procedurally defaulted. We reject them on that basis.[3]

The petitioners' right-to-counsel claims stand on more solid procedural ground. Those claims were adequately raised below. We turn, then, to their viability.

As the government repeatedly reminds us, aliens have no constitutional right to counsel in removal proceedings. See Lozada v. INS, 857 F.2d 10, 13 (1st Cir. 1988); see also INS v. Lopez-Mendoza, 468 U.S. 1032, 1038 (1984) (stating that since "[a] deportation proceeding is a purely civil action to determine eligibility to remain in this country . . . various protections that apply in the context of a criminal trial do not apply in a deportation proceeding"). But aliens nonetheless are entitled to due process, Lozada, 857 F.2d at 13, and the INA provides that, in removal proceedings, an alien "shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose." 8 U.S.C. § 1362.

---

[3]Although the petitioners' amended complaint asserts that ICE violated their due process rights by removing them from Massachusetts prior to holding bond hearings, that claim has not been squarely raised on appeal. The petitioners' brief only mentions the right to a bond hearing in passing, and it is settled that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Consequently, we need not probe this point more deeply.

In this instance, the petitioners claim that their detention and subsequent transfer by the government infringed their rights to counsel by barring their access to lawyers, interfering with preexisting attorney-client relationships, and making it difficult to secure counsel of their choosing. The threshold questions are whether these claims arise from removal and if so, whether they can be deemed independent of, or collateral to, the removal process (and, thus, not subject to the channeling effect of section 1252(b)(9)). Our answers to these questions require us to hold that the petitioners' right-to-counsel claims must be administratively exhausted.

The shorthand response to the petitioners' plaint is that claims that are based upon an alleged deprivation of an alien's right to counsel in connection with a removal proceeding, whether pending or imminent, arise from the removal proceeding. By any realistic measure, the alien's right to counsel is part and parcel of the removal proceeding itself. See 8 U.S.C. § 1362. So viewed, an alien's right to counsel possesses a direct link to, and is inextricably intertwined with, the administrative process that Congress so painstakingly fashioned.

The frequency with which right-to-counsel claims arise in removal proceedings refutes any notion that such claims are sufficiently separate from removal proceedings to be considered either "independent" or "collateral." Challenges to removal orders

premised on the government's putative violation of an alien's right to counsel are commonplace, and such claims are often featured in petitions for judicial review of removal orders. See, e.g., Michel v. INS, 206 F.3d 253, 258 (2d Cir. 2000); Batanic v. INS, 12 F.3d 662, 667 (7th Cir. 1993); Rios-Berrios v. INS, 776 F.2d 859, 862-64 (9th Cir. 1985). Ultimately, allowing aliens to ignore the channeling provisions of section 1252(b)(9) and bring right-to-counsel claims directly in the district court would result in precisely the type of fragmented litigation that Congress sought to forbid.

In this instance, requiring the administrative exhaustion of such claims does not, in the Supreme Court's phrase, "foreclose all meaningful judicial review" of the claims. Thunder Basin, 510 U.S. at 212-13. The petitioners unquestionably have the right, under the INA, to raise these claims before the immigration judge, before the Board of Immigration Appeals (BIA), and ultimately before the court of appeals. See, e.g., Mitchell, 206 F.3d at 256-57. Thus, the petitioners — in contrast to the plaintiffs in cases like Bowen and Mathews — can receive effective relief for their alleged violations of the right to counsel simply by navigating the channels deliberately dredged by Congress.

The proof of the pudding lies in the petitioners' collective experiences. See supra note 1. In accordance with applicable regulations, see 8 C.F.R. § 1003.29, each petitioner who

requested a continuance for the purpose of retaining counsel received one. Many others have been granted changes in venue, moving their cases from Texas to Massachusetts. See 8 C.F.R. § 1003.20(b). Each petitioner who raised an issue of this sort may seek review, first by the BIA and then by the regional court of appeals, of any adverse determination impacting his or her right to counsel.

We note, moreover, that the petitioners, who assert that they will be irreparably harmed if they are required to exhaust their right-to-counsel claims administratively, have not satisfactorily explained how or why this is so. We find irreparable harm lacking in this instance. The absence of any such harm places this case at a considerable remove from cases like Bowen and Mathews, in which the delay attendant to the exhaustion of administrative remedies likely would have engendered irreparable injury. See Bowen, 476 U.S. at 483-84 (not requiring exhaustion of administrative remedies because doing so might "trigger a severe medical setback") (citation and internal quotation marks omitted); Mathews, 424 U.S. at 331 (not requiring exhaustion because plaintiff's physical condition and dependence on disability benefits would, in the event, "damage him in a way not recompensable through retroactive payments").

## C.

The petitioners have another string to their bow: they invoke the doctrine of constitutional avoidance. See Ashwander v. TVA, 297 U.S. 288, 341 (1936) (Brandeis, J., concurring); United States v. Nascimento, 491 F.3d 25, 38 (1st Cir. 2007). Specifically, they contend that requiring exhaustion of their right-to-counsel claims will give rise to a substantive constitutional question similar to that noted by the Supreme Court in McNary. This contention cannot withstand scrutiny.

The McNary claimants alleged that the Immigration and Naturalization Service (INS) — the predecessor agency to ICE — arbitrarily conducted its special agricultural workers program and, in so doing, violated their due process rights. 498 U.S. at 487. In particular, they complained that the INS (i) precluded applicants from presenting witnesses or otherwise challenging adverse evidence on which initial benefit denials had been predicated; (ii) failed to furnish competent interpreters; and (iii) neglected to arrange for verbatim recording of interviews, thus inhibiting meaningful administrative review of on-the-ground decisions. Id. at 487-88.

The Supreme Court expressed understandable concern about this procedural matrix. See id. at 496 (reasoning that because review of agency action was "confined to the record made in the proceeding at the initial decisionmaking level," the lack of an

-24-

adequate record ensured that there would be "no complete or meaningful basis upon which to review application determinations"); see also id. at 497 (explaining that barring district court review would deprive the claimants of needed "factfinding and record-developing capabilities"). Given these deficiencies, the Court questioned the application of INA's exhaustion requirements to claims alleging a "pattern and practice" of such due process violations. See id. at 496-97. The Court suggested that the claims were "collateral" to the review of program status determinations and, thus, not covered by the exhaustion requirements. Id. at 492.

The petitioners' analogy to McNary is imperfect. In the last analysis, McNary was a statutory construction case. The Court held that the statute governing review of special agricultural worker program status determinations did not bar district courts from exercising jurisdiction over due process pattern and practice claims that challenged the program's characteristic procedures. Id. The Court noted that if Congress had intended to require exhaustion of such claims, it could have used clear language to that effect. Id. at 494 (stating that Congress "could have modeled the [statute] on 38 U.S.C. § 211(a), which governs review of veterans' benefits claims, by referring to review 'on all questions of law and fact'").

This holding is of little succor to the petitioners. Section 1252(b)(9) sweeps much more broadly than the statute at issue in McNary. Indeed, its text tracks the very language suggested by the McNary Court as a means of consolidating claims for review and channeling into removal proceedings. See 8 U.S.C. § 1252(b)(9) (providing for "judicial review of all questions of law and fact" arising from removal). This language is expansive enough to cover right-to-counsel claims brought by aliens in connection with removal proceedings.

Here, moreover, the right-to-counsel claims do not give rise to potential constitutional problems of the kind that troubled the McNary Court. In contrast to McNary, the petitioners do not challenge the manner in which an entire program — removal writ large — is being implemented. They do not claim that the INA's basic review procedures deny aliens the opportunity to call witnesses or challenge adverse evidence. And, finally, they do not denigrate the accuracy of the administrative record normally compiled in the immigration court. Whereas in McNary, the lack of a verbatim transcript made some degree of factfinding essential to a determination of whether the initial hearing afforded due process, id. at 497, no such problems are apparent here.

The bottom line is that immigration judges possess ample evidence-gathering faculties, including the authority to administer oaths, receive evidence, issue subpoenas, call witnesses, and

entertain cross-examination. See, e.g., 8 U.S.C. § 1229a(b)(1). As previously noted, they routinely take evidence on, and adjudicate, claims alleging violations of the right to counsel. See, e.g., Wang v. Ashcroft, 367 F.3d 25, 28 (1st Cir. 2004); Bernal-Vallejo v. INS, 195 F.3d 56, 63-64 (1st Cir. 1999). Thus, the petitioners' individual right-to-counsel claims will need no supplemental factfinding in order to create a solid platform for further administrative and judicial review.

This means, of course, that reviewing tribunals, whether administrative or judicial, can fairly hear and determine, on the basis of the record compiled before the immigration judge, charges that ICE's actions during and after the Bianco factory raid transgressed a particular petitioner's right to counsel. Given this reality, we are led inexorably to two conclusions. First, McNary is distinguishable. Second, the doctrine of constitutional avoidance is not in play in this case. See U.S. ex rel Att'y Gen. v. Del. & Hudson Co., 213 U.S. 366, 408 (1909) (explaining that constitutional avoidance canon applies only if "grave and doubtful constitutional questions arise" from a particular statutory construction).

The petitioners mount several other efforts to subvert the INA's exhaustion requirements and the channeling mechanism of section 1252(b)(9). The first of these consists of styling their claims as class-wide pattern and practice claims. They argue that

-27-

their claims do not challenge any individual legal deprivation but, rather, limn class-wide violations of constitutional and statutory rights arising from an unwholesome, but institutionalized, pattern and practice of conduct on the part of ICE.

This construct seems to suggest that class-wide pattern and practice claims are always substantively different from individual claims because the former challenge an established policy of the agency, not an individual constitutional or statutory deprivation. While there may be qualitative as well as quantitative distinctions between class-wide pattern and practice claims, on the one hand, and individual claims, on the other hand, see, e.g., El Rescate Legal Servs., Inc. v. Exec. Office of Immigr. Rev., 941 F.2d 950, 953 (9th Cir. 1991), merely conglomerating individual claims and posturing the conglomeration as a pattern and practice claim does not have talismanic effects. A pattern and practice claim is not a freestanding cause of action but merely a method of proving an underlying legal violation. See, e.g., Celestine v. Petroleos de Venezuela SA, 266 F.3d 343, 355 (5th Cir. 2001).

Nor do we think that aliens can dodge the channeling machinery of section 1252(b)(9) simply by draping individual claims in the mantle of a class action. Although the class action device constitutes an important weapon in the modern litigator's armamentarium, it is merely a procedural device governed by Federal

Rule of Civil Procedure 23, and Congress retains the power to restrict its availability. See, e.g., 8 U.S.C. § 1252(e)(1)(B) (forbidding the certification of class actions in cases under 8 U.S.C. § 1225(b)(1)); McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 423 (1st Cir. 2007) (holding that class action treatment is not available for TILA rescission claims).

We add, moreover, that courts must always be wary of strategic behavior designed to sidestep exhaustion requirements. See, e.g., Booth v. Churner, 532 U.S. 731, 741 (2001); Coleman v. Thompson, 501 U.S. 722, 732 (1991). That caveat has obvious relevance when aliens seek to employ the class action format to evade the INA's channeling requirements. Cf. Swan v. Stoneman, 635 F.2d 97, 105 n.9 (2d Cir. 1980) (suggesting that a district court may consider whether a "class claim has been added merely to avoid the exhaustion requirement").

Ultimately, then, we must discount nomenclature and follow the time-honored precept that substance trumps form. See Nashville, C. & St. L. Ry. v. Wallace, 288 U.S. 249, 259 (1933); Penhallow v. Doane's Adm'rs, 3 U.S. (3 Dall.) 53, 104 (1795); SEC v. SG Ltd., 265 F.3d 42, 46-47 (1st Cir. 2001). Put bluntly, we must look through such easy evasions as creative labeling and consider the fundamental nature of the claims asserted. We cannot allow collective end runs around congressional directives.

Let us be perfectly clear. We do not suggest that section 1252(b)(9) strips district courts of jurisdiction over all pattern and practice claims. As the Supreme Court suggested in McNary, 498 U.S. at 496, requiring exhaustion of certain pattern and practice claims might result in a total denial of meaningful judicial review. The trick is to distinguish wheat from chaff, that is, to distinguish what must be exhausted from what need not be exhausted. In that endeavor, the most salient questions involve whether the underlying claims are cognizable within the review process established by Congress, and if so, whether enforcement of the exhaustion requirement will allow meaningful judicial review without inviting an irreparable injury. Cf. Mathews, 424 U.S. at 331 n.11 (underscoring that "the nature of the claim being asserted and the consequences of deferment of judicial review are important factors in determining whether a statutory requirement of finality has been satisfied"). When, as in this case, the answers to these queries yield no persuasive reason for bypassing the channels that Congress has created, the use of pattern and practice or class action nomenclature cannot alter the result.

The petitioners' remaining effort to circumvent the channeling requirements of section 1252(b)(9) rests on a contention that the administrative and judicial review provisions of the INA are constitutionally suspect because they foreclose the availability of a particular type of remedy. In essence, they

suggest that channeling their right-to-counsel claims into the immigration court might raise constitutional concerns because broad-based declaratory and injunctive relief would not be available in that forum. We reject this suggestion.

While "every right, when withheld, must have a remedy, and every injury its proper redress," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 147 (1803), Congress has wide latitude in choosing which remedy or remedies are appropriate for the violation of a particular constitutional right. See generally Henry M. Hart, Jr., The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L. Rev. 1362, 1366 (1953). Congress possesses the power to regulate the jurisdiction of the lower federal courts, see, e.g., Cary v. Curtis, 44 U.S. (3 How.) 236, 245 (1845), and the Supreme Court has not found constitutional difficulties in congressional abrogation of certain remedies as long as others are left intact. See, e.g., Lauf v. E.G. Shinner & Co., 303 U.S. 323, 330 (1938) (rejecting an argument that restrictions on injunctive relief contained in the Norris-LaGuardia Act offend the Constitution); Cary, 44 U.S. at 250 (upholding Congress's abolition of a cause of action against a tax collector based in part on the fact that the claimant "was not without other modes of redress"); cf. Swain v. Pressley, 430 U.S. 372, 381 (1977) (holding that "the substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a

-31-

person's detention does not constitute a suspension of the writ of habeas corpus").

Courts also have rebuffed litigants' attempts to bypass congressionally mandated exhaustion requirements by demanding remedies that the administrative procedures cannot grant. See, e.g., Booth, 532 U.S. at 741 (holding that prisoners must exhaust administrative remedies under the Prison Litigation Reform Act "regardless of the relief offered through administrative procedures"); Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 61 (1st Cir. 2002) ("Exhaustion is beneficial regardless of whether the administrative process offers the specific form of remediation sought by a particular plaintiff.").

To sum up, while Congress probably cannot nullify rights guaranteed in the Constitution by prohibiting all remedies for the violation of those rights, see, e.g., Webster v. Doe, 486 U.S. 592, 603 (1988) (requiring clear expression of congressional intent to preclude judicial review of constitutional claims); but see id. at 613 (Scalia, J., dissenting) (asserting that "it is simply untenable that there must be a judicial remedy for every constitutional violation"), this is not such a case. The remedies left open by section 1252(b)(9) are neither inadequate nor ineffective to protect the petitioners' rights. Cf. Swain, 430 U.S. at 381 (limning this test in the habeas context). Each petitioner's right to counsel can be adequately addressed and

effectively vindicated before an immigration judge (who can grant a continuance, order a change of venue, or take other pragmatic steps to ensure that the right is not sullied). In turn, those orders can be meaningfully reviewed, first by the BIA and then by the court of appeals. No more is exigible to uphold the district court's dismissal of the petitioners' right-to-counsel claims.

Before concluding this phase of our discussion, we deem it advisable to add that, in an abundance of caution, we have sifted through the petitioners' pleadings, briefs, and other submissions. To the extent that they arguably have raised procedural due process claims above and beyond their right-to-counsel claims — such as their vaguely articulated plaints about difficulties in calling witnesses and in presenting evidence at the removal proceedings — we find that section 1252(b)(9) mandates their exhaustion.

Our reasoning is by now familiar. The petitioners' procedural due process rights "arise from" removal in that they are part of the fabric of the removal proceedings themselves. This imbrication is borne out by the fact that, like right-to-counsel claims, claims alleging violations of the right to procedural due process are commonplace in petitions for administrative and judicial review of removal orders. See, e.g., Frech v. U.S. Att'y Gen., 491 F.3d 1277, 1281-82 (11th Cir. 2007); Enwonwu v. Gonzales, 438 F.3d 22, 31 (1st Cir. 2006); see also Gandarillas-Zambrana v.

-33-

BIA, 44 F.3d 1251, 1255-56 (4th Cir. 1995) (considering virtually identical due process claims on appeal from a final order of deportation).

We conclude, therefore, that given the nature of those claims and their wonted treatment, they cannot plausibly be viewed as either independent of, or collateral to, removal proceedings.[4] It follows that the channeling mechanism of section 1252(b)(9) governs such claims (if, indeed, they have been properly pleaded and adequately developed).

### D.

This leaves only the petitioners' substantive due process claims, which allege violations of the Fifth Amendment right of parents to make decisions as to the care, custody, and control of their children. See, e.g., Troxel v. Granville, 530 U.S. 57, 65 (2000). We conclude that, unlike most of the petitioners' other claims, these claims are collateral to removal and, thus, outside the channeling mechanism of section 1252(b)(9).

We set the stage. The petitioners were carted away unceremoniously at the time of the factory raid. They allege that

---

[4]To be sure, we have suggested that a "denial of due process may, in certain limited circumstances, be exempt from the ordinary exhaustion requirement," Jupiter, 396 F.3d at 492. Withal, we have underscored that "[t]hese circumstances are rare and are restricted to claims that are beyond the authority of the agency to adjudicate." Id. The petitioners have not demonstrated that their claims deserve such extraordinary treatment.

their immediate detention, the subsequent string of transfers (many of them to distant climes), and ICE's inadequate efforts either to notify or to work with social service agencies disrupted family units. That alleged disruption forms the centerpiece of their substantive due process claims.

To be sure, these claims bear some connection to removal. But the link is tenuous: the right to family integrity is only marginally related to removal, the harm from continuing disruption may be irretrievable, and the issue is not one with which the immigration court ordinarily would grapple. Thus, reading section 1252(b)(9) to mandate administrative exhaustion of a substantive due process claim that asserts this kind of "family integrity" violation likely would sound the death knell for meaningful judicial review. The issue of family integrity is completely irrelevant to the mine-run of issues that will be litigated in removal proceedings, and the claims have no bearing on the aliens' immigration status. To cinch matters, the petitioners have no other means within their control through which to protect or enforce the asserted right.

Holding that the district court lacked jurisdiction over these substantive due process claims not only would be inconsistent with the express purpose of section 1252(b)(9) — which is to channel claims, not to bar them — but also would contradict the presumption favoring judicial review of administrative actions.

-35-

See Abbott Labs., 387 U.S. at 141.  And, finally, because the petitioners would be left without any effective remedy, they would be irreparably harmed by this proposed application of the exhaustion requirement.

In reaching the conclusion that the family integrity claims are collateral and, thus, not subject to the exhaustion requirement, we do not break with precedent.  Contrary to the government's insinuations, this case is distinct from cases like Payne-Barahona v. Gonzales, 474 F.3d 1 (1st Cir 2007).  There, the alien unsuccessfully attempted to wedge a family integrity claim into a removal proceeding.  Id. at 2.  Here, unlike in Payne-Barahona, the petitioners do not base their claims on the notion that their removal will split the family unit and thus violate substantive due process; rather, they contend more narrowly that ICE's failure to allow them time to make arrangements for the care of their children before hauling them off violated their rights to family integrity (and, thus, worked a substantive due process violation).

Because we hold that the district court should not have dismissed this subset of claims for failure to exhaust administrative remedies, we must address the government's alternate argument that a different statutory provision, 8 U.S.C. § 1252(a)(2)(B)(ii), bars the district court from exercising subject matter jurisdiction over all of the petitioners' claims (including

-36-

the substantive due process claims).  That statute provides in pertinent part:

> Notwithstanding any provision of law . . . and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review —
>
> * * *
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter [8 U.S.C. §§ 1151-1381] to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . .

Id.  For present purposes, this language must be read in conjunction with 8 U.S.C. § 1231(g)(1), which provides that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."

The government says that the latter statute entrusts both the timing and placement of an alien's detention to the unfettered discretion of the Attorney General. Building on that foundation, it posits that those sorts of wholly discretionary decisions are unreviewable under section 1252(a)(2)(B)(ii).  Accordingly, the government urges us to find that the district court lacked jurisdiction over constitutional and statutory claims, such as the substantive due process claims advanced by the petitioners, arising out of the petitioners' detention and transfers.

We reject the government's sprawling construction of section 1252(a)(2)(B)(ii). As we have noted before, so broad a reading is not evident from the statute's text. See Royal Siam Corp. v. Chertoff, 484 F.3d 139, 143 (1st Cir. 2007). A more natural reading would leave the petitioners' substantive due process claims outside the reach of the statute.

In the first instance, there is considerable uncertainty as to whether section 1231(g)(1) encompasses the authority to transfer detainees. The first sentence of the provision — granting the power to "arrange for appropriate places of detention for aliens detained" — suggests that it might; the second sentence, which authorizes the Attorney General "to acquire land and to acquire, build and remodel, repair, and operate facilities," reflects more of a bricks-and-mortar orientation.

Here, however, this question of statutory interpretation is of mainly academic interest. We need not resolve it because, in all events, section 1231(g) fails to "specify" that individualized transfer decisions are in the Attorney General's discretion. This is in stark contrast to other sections of the INA. See, e.g., 8 U.S.C. §§ 1157(c)(1), 1181(a)(9)(B)(v), 1184(c)(6)(F), 1229b(b)(2)(D); see also Alaka v. Att'y Gen., 456 F.3d 88, 97 (3d Cir. 2006) (stating that "there are no less than thirty-two additional provisions in the very subchapter of the INA referenced by 8 U.S.C. § 1252(a)(2)(B)(ii) that make explicit the grant of

-38-

'discretion' to the Attorney General or the Secretary of Homeland Security"). If a statute does not explicitly specify a particular authority as discretionary, section 1252(a)(2)(B)(ii) does not bar judicial review of an ensuing agency action. See Alsamhouri v. Gonzales, 484 F.3d 117, 122 (1st Cir. 2007).

We are aware that one respected court has stated that section 1252(a)(2)(B)(ii) pretermits judicial review of the Attorney General's decision to transfer detainees. Van Dinh v. Reno, 197 F.3d 427, 433 (10th Cir. 1999). There, the panel said that it was giving effect to the "literal meaning" of the statute. Id. But this is a minority view: as other courts have recognized, the plain language of the statute calls that statement into question. See Zhao v. Gonzales, 404 F.3d 295, 303 n.6 (5th Cir. 2005) (concluding that "Van Dinh . . . misstates the statutory text" and "analyze[s] statutory language that Congress did not adopt"); Spencer Enters., Inc. v. United States, 345 F.3d 683, 691 (9th Cir. 2003) (finding Van Dinh's reasoning unpersuasive because "the plain language of [section] 1252(a)(2)(B)(ii) requires that discretionary authority be specified by the statute").

We share the view of the Fifth and Ninth Circuits. Consequently, we reject Van Dinh and hold that section 1252(a)(2)(B)(ii) does not strip the district courts of jurisdiction over substantive due process claims that are collateral to removal proceedings when those claims challenge

decisions about the detention and transfer of aliens on family integrity grounds.

**E.**

Although the petitioners' substantive due process claims survive the INA's jurisdictional gauntlet, the government contends in the alternative that these statements of claim fail to limn causes of action on which relief may be granted. See Fed. R. Civ. P. 12(b)(6). The district court did not reach this issue, but we can affirm its order of dismissal on any alternative ground made manifest in the record. See InterGen, 344 F.3d at 141. Thus, we test the viability of the substantive due process claims, accepting as true all the well-pleaded factual averments in the amended complaint and drawing all reasonable inferences therefrom in the petitioners' favor. Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 62 (1st Cir. 2004).

We begin with bedrock. The Fifth Amendment mandates that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The due process guarantee has both procedural and substantive aspects. Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990). Its substantive component is at issue here. That component bars certain offensive government actions "regardless of the fairness of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 331 (1986).

The criteria for identifying whether government action offends the guarantee of substantive due process hinge on the nature of the challenged government action.  See County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998); DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005).  When challenging executive action under the imprimatur of substantive due process, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  Lewis, 523 U.S. at 847 n.8.  This mantra reflects a realization that challenges to executive action must be viewed through the prism of "a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to what we have called a font of tort law."  Id.

Consistent with this need to refrain from constitutionalizing ordinary misfeasance or malfeasance, the "shock the conscience" standard erects a high hurdle for would-be claimants. As a result, "liability for negligently inflicted harm is categorically beneath the threshold of [substantive] due process."  Id. at 849.  Indeed, "the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error."  Amsden, 904 F.2d at 754 n.5.  That strain of exaggerated arbitrariness historically has involved "deliberate decisions of government officials to deprive a person of life, liberty, or

-41-

property." Daniels, 474 U.S. at 331. Thus, "[e]xecutive branch action that sinks to the depths of shocking the contemporary conscience is much more likely to find its roots in 'conduct intended to injure in some way unjustifiable by any government interest.'" DePoutot, 424 F.3d at 119 (quoting Lewis, 523 U.S. at 849).

Here, the petitioners claim in essence that their immediate detention and swift transfer to distant DROs wreaked havoc with their right to make decisions about the care, custody, and control of their minor children, leaving many minors unattended. But neither the petitioners' amended complaint nor their briefs offer any reason to believe that ICE's actions were so "extreme, egregious, or outrageously offensive" as to cross the "shock the conscience" line. DePoutot, 424 F.3d at 119. We elaborate below.

The petitioners state cursorily in their amended complaint that the government "willfully" interfered with their rights. But any claim of an intentional deprivation is belied by the petitioners' concession that ICE took at least some measures to alleviate any resultant harm.[5] Moreover, the petitioners do not

---

[5]This concession squares with the district court's supportable findings that ICE attempted to coordinate with social services agencies to assure the adequate care of dependent children and in fact took affirmative steps before and after the raid to attend to family needs. Aquilar, 490 F. Supp. 2d at 43-44. The district court likewise found that ICE immediately released thirty-five persons who had been apprehended due to "pressing humanitarian

-42-

make any showing that the amount of time during which they were denied the ability to make arrangements for their children was disproportionate to what was reasonably necessary to process the large number of aliens detained during the factory raid. While ICE's actions during and after the raid seem callous in certain respects, the facts alleged suggest no more than negligence or misordered priorities.

Our thinking is influenced by a realization that the evenhanded enforcement of the immigration laws, in and of itself, cannot conceivably be held to violate substantive due process. See Payne-Barahona, 474 F.3d at 2; De Robles v. INS, 485 F.2d 100, 102 (10th Cir. 1973). Any interference with the right to family integrity alleged here was incidental to the government's legitimate interest in effectuating detentions pending the removal of persons illegally in the country. See Demore, 538 U.S. at 523 (recognizing "detention during deportation proceedings as a constitutionally valid aspect of the deportation process").

This is critically important because every such detention of a parent, like every lawful arrest of a parent, runs the risk of interfering in some way with the parent's ability to care for his or her children. See Payne-Barahona, 474 F.3d at 3. That a detention has an impact on the cohesiveness of a family unit is an

needs" (such as being the sole caregiver of one or more minor children). Id. at 43 n.3.

inevitable concomitant of the deprivation of liberty inherent in the detention itself.  So long as the detention is lawful, that so-called deprivation of the right to family integrity does not violate the Constitution.

We hold, therefore, that such an incidental interference, standing alone, is not of constitutional magnitude.  To rule otherwise would risk turning every lawful detention or arrest of a parent into a substantive due process claim.  That would place new and unprecedented constraints on law enforcement activities.  Such constraints would be unwarranted.

Applying the jurisprudence of substantive due process is an exercise that is "highly dependent on context and detail." DePoutot, 424 F.3d at 119.  Were a substantial number of young children knowingly placed in harm's way, it is easy to imagine how viable claims might lie.  But to state a cause of action for a substantive due process violation, the petitioners' pleading would have to allege facts that showed a plausible entitlement to relief. Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1968-69 (2007).  The petitioners have not scaled this barrier.[6]

One further point is worthy of mention.  While the "shock the conscience" test comprises the threshold inquiry with respect

_____

[6]We take no view on whether an abandoned child might in certain circumstances have a cause of action for damages against a responsible government actor.  See, e.g., White v. Rochford, 592 F.2d 381 (7th Cir. 1979).  That issue is not before us.

-44-

to substantive due process violations, the petitioners also must show that the government deprived them of a protected interest in life, liberty, or property. See Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006); see also Lewis, 523 U.S. at 847 n.8 (asserting that the "shock-the-conscience" inquiry "may be informed by a history of liberty protection"). Here, the nature of the underlying right asserted by the petitioners reinforces our conclusion that they have not stated a viable substantive due process claim.

We see the matter this way. Although the interest of parents in the care, custody, and control of their offspring is among the most venerable of the liberty interests protected by the Fifth Amendment, see, e.g., Troxel, 530 U.S. at 65; Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 20 (1st Cir. 2001), the petitioners have not demonstrated that this guarantee of substantive due process encompasses their assertions. After all, the right to family integrity has been recognized in only a narrow subset of circumstances.

To be sure, the petitioners cite cursorily to cases that deal with this right but they conspicuously fail to build any bridge between these cases and the facts that they allege. We do not think that this is an accident. The petitioners' claims seem markedly different from those scenarios that courts heretofore have recognized under the rubric of family integrity. They have not

alleged that the government has interfered permanently with their custodial rights.  See, e.g., Stanley v. Illinois, 405 U.S. 645, 649 (1972).  Nor have they alleged that the government has meddled with their right to make fundamental decisions regarding their children's education, see, e.g., Meyer v. Nebraska, 262 U.S. 390, 400 (1923), or religious affiliation, see, e.g., Wisconsin v. Yoder, 406 U.S. 205, 232 (1972).  Taken most favorably to the petitioners, the interference alleged here is transitory in nature and in no way impinges on parental prerogatives to direct the upbringing of their children.

We have scoured the case law for any authority suggesting that claims similar to those asserted here are actionable under the substantive component of the Due Process Clause, and we have found none.[7]  That chasm is important because, given the scarcity of "guideposts for responsible decisionmaking in this unchartered area," courts must be "reluctant to expand the concept of substantive due process."  Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (quoting Collins v. Harker Heights, 503 U.S. 115, 125 (1992)).

---

[7]For example, the petitioners suggest that they had the right to contact their family members immediately following their detention.  That is simply incorrect.  Even one accused of committing a crime does not have an absolute right to place a telephone call immediately upon his apprehension.  See Harrill v. Blount County, 55 F.3d 1123, 1125 (6th Cir. 1995).

This unfortunate case is a paradigmatic example of an instance in which the prudential principle announced by the Collins Court should be heeded.  Accordingly, we dismiss the petitioners' substantive due process claims for failure to satisfy the prerequisites of Federal Rule of Civil Procedure 12(b)(6).

## III.

We are sensitive to the concerns raised by the petitioners and are conscious that undocumented workers, like all persons who are on American soil, have certain inalienable rights.  But in the first instance, it is Congress — not the judiciary — that has the responsibility of prescribing a framework for the vindication of those rights.  When Congress speaks clearly and formulates a regime that satisfies constitutional imperatives, the courts must follow Congress's lead.  In that sense, it does not matter whether a court approves or disapproves of an agency's modus operandi.

We add only two comments.  First, we applaud the able district judge for the skill and sensitivity with which he handled this highly charged case.  Second, we express our hope that ICE, though it has prevailed, nonetheless will treat this chiaroscuro series of events as a learning experience in order to devise better, less ham-handed ways of carrying out its important responsibilities.

**The judgment of dismissal is affirmed.  All parties shall bear their own costs.**